PUTNAM and another *v.* HOLLENDER and another.

*(Circuit Court, S. D. New York. February 10, 1881.)*

1. PLEADING—JOINT AND SEPARATE INFRINGEMENT—PROOF.

In a suit for infringement the bill alleged that the defendants had "jointly and collectively, and also separately," used and sold bottle-stoppers containing the patented invention. *Held,* (although no joint sale or use was shown,) as the bill was framed to recover for separate infringements, and was not demurred to on that ground, and the case had gone on under that issue, that the plaintiff could maintain the suit as a suit against each defendant separately.

2. COMBINATION—TRANSPOSITION OF PARTS—INFRINGEMENT—IMPROVEMENT IN BOTTLE-STOPPERS.

Re-issued letters patent granted to Karl Hutter, June 5, 1877, for an improvement in bottle-stoppers, claimed, *inter alia:* "(1) The combination, substantially as before set forth, of the compound stopper, the yoke, the lever, and the supporting device on the bottle, by means of three pivotal connections, upon which the said members can be turned relatively to each other without disconnecting either one from the other." *Held,* that the mere transposition of the places of the yoke and the lever did not constitute such a substantial difference in respect to the invention, or the mode of operating the combination, as would avoid infringement.

3. LICENSE—CONSTRUCTION.

A patentee authorized a licensee to use and manufacture his invention "for his own proper business," to a specified amount per annum. *Held,* in the absence of affirmative authority, that a sublicense was not authorized by such agreement.

4. Prior Invention—Burden of Proof.

Where prior invention is set up as a defence in a suit for infringement, the burden of proof rests upon the defendant, and every reasonable doubt should be resolved against him.

5. Same—Evidence.

The invention or discovery relied upon as a defence must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant.—[Ed.

*Arthur v. Briesen,* for plaintiffs.

*George W. Yeaman,* for defendants.

BLATCHFORD, C. J.    This suit is brought on re-issued letters patent granted to Karl Hutter, June 5, 1877, for an "improvement in bottle-stoppers," the original patent having been granted to Charles De Quillfeldt, as inventor, January 5, 1875.    The specification of the re-issue says:

"The object of this invention is to permit bottle mouths to be readily and securely closed and readily opened, without disconnecting the stopping devices from the bottle.    To this end my invention consists of a certain new elastic stopple, and of certain new combinations of devices, of which the following are the principles, viz.: A compound stopper composed of a rigid annular member adapted to withstand the strains incident to closing the bottle, and an elastic disk intervening between the said rigid member and the bottle mouth so as to prevent the contact of the rigid member with the glass of the bottle, and to close the bottle mouth tightly, the disk having an upwardly projecting stem which extends through the rigid member; an elastic and flexible disk-stopper of small thickness compared with its diameter, and provided with a stem, said stem serving to connect said elastic disk-stopper to a yoke or frame by which the same is attached to the bottle; a yoke or bail adapted to straddle the bottle mouth and constitute one of the devices by means of which the elastic stopper is connected with or linked to the bottle, so that said stopper remains connected with the bottle although the bottle mouth is open; a lever which is connected with said yoke or bail, and by means of which the elastic stopper can be forced downward and compressed to close the bottle mouth tightly.    The lever constitutes one of the de-

vices by means of which the compound stopper is connected with the bottle, whether the bottle mouth is closed or open, and the pivots and eyes of the lever constitute parts of two pivotal connections, whereby it may be connected with the compound stopper and with the bottle mouth, so as to turn or swing for the purpose of utilizing its lever property. The several combinations of the above-mentioned devices, which constitute the invention, are set forth in the claims at the close of this specification. In order that they may be fully understood, I have represented in the accompanying drawing, and will proceed to describe, the mode in which I embodied them for practical use at the time of filing the application for my original patent. Figure 1 represents a front view of the bottle-stopping devices in the positions severally occupied by them when the bottle is closed. Figure 2 is a vertical transverse section of parts of the same. Figure 3 is a side view of the devices showing the compound stopper disengaged from the bottle mouth, but still connected with the bottle. The compound stopper represented in the said drawing is composed of the rigid cap-piece, E, and the elastic member, D, which is made of rubber or other elastic material. The elastic member, D, has the form of a disk of small thickness compared with its diameter, so that it is flexible, and may readily bend to conform to the form which may be given to the cap-piece. It is also constructed with a central shank or stem, e, which is perforated transversely near its upper end so that a wire may be passed through it to prevent its withdrawal from the. cap-piece, E, which is perforated centrally to permit the stem of the rubber disk to be passed through it. The lower surface of the disk, D, is of larger diameter than the opening in the mouth of the bottle to which said disk is to be applied. The compound stopper, composed of the rigid cap-piece and elastic member, is connected with the bottle by means of a lever, B, and yoke, C, which are connected with each other with the bottle and with the compound stopper by pivotal connections, so as to permit the lever, yoke, and stopper to be turned relatively to the bottle, and to each other, for the purpose of forcing the compound

stopper downward to close the mouth of the bottle with the force incidental to the power of the lever, but also to maintain the connection between the compound stopper and the bottle when the latter is opened, in which case the compound stopper is still linked to the bottle through the lever and yoke. The pivotal connection between the yoke, C, and the lever, B, is formed by the bent ends of the yoke entering eyes, *bb*, of the lever, B. The pivotal connection by means of which the connected lever and yoke are held to the bottle is formed by the bent ends of the lever entering as pivots into the eyes, *a' a'*, of a band, *a*, which is secured to the exterior of the bottle neck, and the pivotal connection by which the connected yoke and lever are held to the compound stopper is formed by the central part of the yoke, which passes through, and turns as a pivot in, the transverse perforation of the stem, *e*. The yoke, C, is constructed to straddle the bottle mouth, and the lever, B, is constructed of yoke form to straddle the bottle neck; one set of the pivotal connections being at its ends, while another is intermediate between its ends and its handle end, *d*. The intermediate pivotal connection is at a sufficient distance from the end pivotal connection, and from the handle end of the lever, and so placed that when the lever has been turned against the bottle to the position to hold the compound stopper so that it closes the bottle mouth, the intermediate pivotal connection is at that time turned past the vertical plane passing through the pivotal connections with the bottle and with the compound stopper, and the compound stopper is thereby locked in its closed position as represented at figure 2. The closing of the bottle is performed by guiding the stopper by hand to the bottle mouth, with the elastic member beneath the cap-piece, and by turning the lever downward and inward, or towards the bottle, to its locked position. The opening of the bottle is performed by turning the lever outward or away from the bottle, so as to raise and liberate the compound stopper, which may then be further moved by hand."

There are nine claims in the re-issue, as follows:

"(1) The combination, substantially as before set forth, of

the compound stopper, the yoke, the lever, and the supporting device on the bottle, by means of three pivotal connections, upon which the said members can be turned relatively to each other without disconnecting either one from the other.

"(2) The combination, substantially as before set forth, of the compound stopper, the lever, and the yoke, by means of two pivotal connections, upon which the said three members can be turned relatively to each other without disconnection, and the pivotal connection of the lever to the bottle, substantially as set forth.

"(3) In combination with a bottle, the flexible elastic stopper disk, whose lower surface is larger than the opening in the mouth of the bottle, and which is provided with an upwardly projecting stem or shank, substantially as before set forth.

"(4) The combination of a perforated rigid cap-piece with the flexible elastic stopper disk, whose lower surface is larger than the opening in the mouth of the bottle, and which is constructed with a stem of reduced diameter, said stem being passed into the perforation of the cap-piece, substantially as before set forth.

"(5) The combination of the rigid cap-piece with the flexible elastic stopper disk, constructed with a laterally perforated stem, through which a wire is passed above said cap-piece to confine said cap-piece to said disk, substantially as specified.

"(6) The combination, substantially as before set forth, of the flexible elastic stopper disk, constructed with a perforated stem, the perforated cap-piece and the yoke, which is passed transversely through the said stem for the purpose of preventing the withdrawal thereof from the cap-piece.

"(7) The combination, substantially as before set forth, of the yoke and the lever, which are directly connected, one with the other, by a pivotal connection, the lever being constructed with end pivots to enable it to be connected pivotally with the supporting device on the bottle.

"(8) The eccentric lever, B, made with two pivotal connections, the one joining it to the bottle, the other to the pivoted

stopple, so that by vibrating said lever on its connection with the bottle it will carry the stopple towards or away from said bottle, substantially as specified.

"(9) The combination of the pivoted bottle-stopper with the yoke, C, neck ring, *a*, and eccentric lever, B, the said yoke and eccentric lever being pivoted together and arranged so that the stopper is forced into the bottle by swinging the handle part of the lever against the side of the bottle, substantially as herein shown and described."

1. The bill alleges that the defendants have "jointly and collectively, and also separately," used and sold bottle-stoppers containing the patented invention. The answer admits that the defendant Fritz Hollender has used bottle-stoppers containing the patented invention, as a member of the firm of Hollender & Co., composed of himself and Emil Hollender. It avers that the defendant William Hollender has been book-keeper and salesman of said firm. It admits that the defendant William Hollender has sold bottle-stoppers containing the patented invention on his individual account, and not in connection with the other defendant, or with the firm of Hollender & Co. Although no joint sale or use is shown, yet as the bill is framed to recover for separate infringements, and was not demurred to on that ground, and the case has gone on under that issue, the plaintiff can maintain this suit as a suit against each defendant separately. It is shown by the proofs that the defendant Fritz Hollender used stoppers like plaintiffs' Exhibit No. 8; that the defendant William Hollender sold like stoppers; and that the defendant Fritz Hollender has made, used, and sold stoppers like plaintiffs' Exhibit No. 11. This makes it necessary to determine whether Exhibits No. 8 and 11 infringe the plaintiffs' re-issue.

Exhibit No. 8 is identical in construction with the drawings of the plaintiffs' re-issue. It therefore infringes all the claims.

In Exhibit No. 11 there is a compound stopper, made of a rigid annular cap and an elastic disk intervening between it and the bottle mouth; a yoke or bail straddling the bottle mouth and serving to connect the stopper with the bottle even

when the stopper is out of the bottle mouth; a lever connected with the yoke, and by means of which the stopper is forced down and compressed to close the bottle mouth tightly; and the lever and the yoke are connected with each other, with the bottle, and with the stopper by pivotal connections, so as to permit the lever, the yoke, and the stopper to be turned relatively to the bottle and to each other, so as to force the stopper down to close the mouth of the bottle with the force incidental to the power of the lever. In the plaintiff's reissue the neck band is pivoted to the lever, the lever to the yoke, and the yoke to the stopper. In Exhibit No. 11 the neck band is pivoted to the yoke, the yoke to the lever, and the lever to the stopper. In both there are four elements,— the neck band, the yoke, the lever, and the stopper,—each connected to one of the other three by a pivotal connection, there being three pivotal connections. The neck band and the stopper are in the same place in both structures, each at one end of the series of four. The places of the yoke and the lever are transposed in the two structures. In the plaintiffs' the lever is next to the neck band, and the yoke is next to the stopper. In Exhibit No. 11 the yoke is next to the neck band and the lever is next to the stopper. But this is the only difference, and it is no difference of substance in respect to the invention and to the mode of operation of the combination of the four elements, in its entirety, as such combination exists in both structures. That is the combination covered by the first claim of the re-issue. The same considerations show that the combination covered by the second claim of the re-issue exists in Exhibit No. 11. Exhibit No. 11 is known as the Von Hofe stopper.

2. The answer sets up that the re-issue covers more than was described in the specification of the original patent, and is not for the same invention. There is no evidence to this effect, and there does not appear to be any ground for the assertion.

3. The answer avers that the plaintiffs' bottle-stopper was, before De Quillfeldt applied for his patent, invented by one Emil Hollender, or by him jointly with De Quillfeldt, and

not by De Quillfeldt alone. The patent was applied for November 30, 1874. Prior to that and on November 24, 1874, De Quillfeldt and Emil Hollender executed an agreement in writing, under seal, as follows: "This agreement and license made this twenty-fourth day of November, 1874, by and between C. De Quillfeldt, of the first part, and Emil Hollender, of the second part, witnesseth, that whereas, invention made by C. De Quillfeldt, party of the first part, for which application has been made this day to secure letters patent of the United States of America, for an improved 'bottle-stopper lock,' and whereas the party of the second part, Emil Hollender, desires to acquire license and privilege with exclusive right to manufacture and sell said bottle-stopper lock, in consideration whereof, he agrees—*First*, to pay C. De Quillfeldt, party of the first part, the sum of seventy-five (75) dollars, cash in hand, receipt of which is acknowledged below, and pay all charges for letters-patent application; *second*, the party of the second part also agrees to pay the party of the first part a royalty of five per cent. (5) on each and all such stopper-locks, at the value of four (4) cents a piece, for a period of seventeen years from date; *third*, the party of the second part further agrees to use due diligence and exertion in making known said bottle-stopper, and keeping the market fully supplied to the best of his ability; *fourth*, any extra service rendered on the part of the party of the first part in favor of the party of the second part after this date will not be included in the above agreement."

Emil Hollender became the subscribing witness to the specification signed by De Quillfeldt on his application for the patent. On the ninth of February, 1875, Emil Hollender not having paid the $75 to De Quillfeldt, De Quillfeldt repaid to Emil Hollender $60 which the latter had paid as expenses of obtaining the patent, and the latter gave up to the former his copy of said agreement, and they regarded it as cancelled. On the tenth of February, 1875, De Quillfeldt assigned to Karl Hutter, one of the plaintiffs, all his right, title, and interest in and to the patent. On the eleventh of February, 1875, Emil Hollender executed to De Quillfeldt a general re-

lease of all claims and demands, "particularly releasing all claims which I may have by reason of a certain agreement entered into between myself and C. De Quillfeldt, on the twenty-fourth day of November, 1874, for the sole manufacture and sale of the improved 'bottle-stopper lock' invented by said C. De Quillfeldt." As a consideration for the execution of that release, Hutter, who was advised that he ought to obtain from Emil Hollender a paper to secure his title, paid to Emil Hollender $150, and they executed an agreement, under seal, of which the following is a copy, on the thirteenth of February, 1875:

"This agreement, made and entered into this thirteenth day of February, 1875, between Karl Hutter, party of the first part, and Emil Hollender, party of the second part, witnesseth: (1) That whereas the said party of the first part has purchased from a certain C. De Quillfeldt a certain patent for 'bottle-stopper,' and the said party of the second part has had an interest therein, now, therefore, it is agreed, by and between the parties hereto, that the said party of the first part hereby allows and privileges the said party of the second part to use the said patent and manufacture the said stoppers, as many as he, the said party of the second part, may need and use for his own proper business, to the amount of 100 gross a year. (2) For which consideration, as above stated, the said party of the second part waives all further interest in said patent."

Notwithstanding the state of facts appearing by the foregoing papers, the sole invention by Emil Hollender, or the joint invention by him and De Quillfeldt, is insisted on. This is based on testimony given by Emil Hollender. But it is shown, by absolute and entirely clear proof, that De Quillfeldt was the inventor, and the sole inventor. An erroneous view is taken of the testimony of Goepel. He does not say that De Quillfeldt and Emil Hollender each said that they invented it jointly. He says that, "on inquiring who was the inventor, they both replied they had invented it." This means that each said, "I am the inventor." This is what Emil Hollender himself says was said to Goepel.

4. The answer sets up that while the defendant Fritz Hollender was carrying on the business of bottling and selling ales, beer, etc., under the name of Hollender & Co., Emil Hollender became a partner with him, under the name of Hollender & Co.; that Emil Hollender at that time held said agreement of February 13, 1875; that when Emil Hollender became a member of the firm of Hollender & Co. he put into it, as his share of its capital stock, the right to use the said bottle-stoppers, so granted to him by Hutter, and that the only use by the firm of Hollender & Co. of the patented bottle-stoppers was a use by virtue of the said right; that the said firm of Hollender & Co. thus has the right to use the patented stoppers to the extent of 100 gross per year; and that such use has never been to that extent.

On the thirteenth of February, 1875, Emil Hollender had a bottling business of his own. He gave it up in April, 1877. October 1, 1877, he made an arrangement with his brother, the defendant Fritz Hollender, whereby the latter was to pay Emil three cents for every 24 stoppers made under the patent, each time the 24 were used. The business consisted in selling beer and ale in the bottles which had the stoppers, the bottles and the stoppers not being sold, but being returned, and the bottles refilled and sent out again.

The evidence shows that Emil was not a partner with Fritz in the business. He had nothing at risk in it. His profits or losses did not depend on the risk of the business. Fritz paid him the three cents on every 24 bottles, without reference to whether the actual profit was more or less, or anything. The three cents was arrived at by figuring that the profit on every 24 bottles of ale or beer would be six cents net, and Emil was to have three cents for every 24 bottles sold. But this did not make him a partner. The use of the stoppers was not a use of them by Emil "for his own proper business." It was a sublicense by Emil, which was not authorized by the agreement. In *Rubber Co.* v. *Goodyear*, 9 Wall. 788, 799, a person was licensed to use Goodyear's invention for a certain purpose, "at his own es-

tablishment, but not to be disposed of to others for that purpose without the consent of" Goodyear.

The court says of this license, that it authorizes the person to use it himself, and gives him no right to authorize others to use it in conjunction with himself, or otherwise, without the consent of Goodyear, and that it was to be used at his own establishment, and not at one occupied by himself and others. In the absence of affirmative authority to Emil Hollender to dispose of the license to others, or to allow it to be availed of by others, it must be read as if it forbade a disposition of it to others.

Enabling Fritz Hollender to make part or the whole of a profit of three cents on 24 bottles, by using stoppers under the license, was dealing with the license in a way not authorized. In *Troy Iron & Nail Factory* v. *Corning*, 14 How. 193, 216, it is said that "a mere license to a party, without having 'his assigns,' or equivalent words to them, showing that it was meant to be assignable, is only the grant of a personal power to the licensee, and is not transferable by him to another."

5. A patent granted by the United States, July 17, 1855, to Jules Jeannotat, for an "improvement in bottle-fastenings," is set up in the answer, and put in evidence, on the question of novelty; but no witness on either side gives any testimony in regard to it, in this suit. I have examined it, however, and, for the reasons assigned in the decision made herewith, in the suit of the same plaintiffs against Vom Hofe, am of opinion that it has no bearing in favor of the defendants in this suit.

6. It remains to consider but one more defence, and that is the alleged prior invention of one Otto. That Otto made, and made some use of, prior to the invention of De Quillfeldt, a structure, the identical original of which, and the bottle to which it was applied, less a round piece cut from a piece of India-rubber hose and tacked by a tack on the center of the diameter of the lower face of the wooden stopper, are now produced, is, I think, established by the evidence. That structure is "Defendants' Exhibit, Otto Bottle-stopper, Oc-

tober 21, 1879." It has an arrangement of neck band, lever, yoke, and rigid upper part of stopper, with three pivotal connections, which, if the whole stopper had been a perfect compound stopper, as the stopper of the plaintiffs' patent is, composed of substantially such an elastic part as said patent shows, with such rigid upper part, and if the whole combination of compound stopper, yoke, lever, and neck-band had been capable of operating in the way the combination set forth in the first claim of the plaintiffs' re-issue operates, to produce effectively the results produced by that combination, would have been an anticipation of that claim and of the second claim. The rule laid down by the supreme court in *Coffin* v. *Ogden*, 18 Wall. 120, 124, is as follows: "The invention or discovery relied upon as a defence must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant. The burden of proof rests upon him, and every reasonable doubt should be resolved against him. If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the point of consummation,—it cannot avail to defeat a patent founded upon a discovery or invention which was completed, while in the other case there was only progress, however near that progress may have approximated to the end in view. The law requires not conjecture, but certainty. If the question relates to a machine, the conception must have been clothed in substantial forms which demonstrate at once its practical efficacy and utility. *Reid* v. *Cutter*, 1 Story, 590. The prior knowledge and use by a single person is sufficient. The number is immaterial. *Bedford* v. *Hunt*, 1 Mason, 302. Until his work is done the inventor has given nothing to the public."

Otto kept a beer saloon. He made only one such structure. He put it upon a bottle. He put beer into the bottle, and had the bottle and structure in his saloon. It was seen by many persons, who saw what it was and worked it, so far as it was capable of being worked. Glasses of beer were poured out of the bottle for customers, and it was refilled. Otto

says he used the structure and bottle in his saloon from two to three times a week, and about two years. Although he sold beer in bottles to be taken away from his saloon and opened elsewhere,—bottles with corks, as he says,—he never sent this bottle and structure away from his saloon. Before he made his structure he had, he says, seen bottles with a patent stopper, of one Schlesting, which had a compound stopper composed of a rigid top piece and an elastic member, and was opened and closed by means of a separate lever or piece of iron. But he says he did not procure the Schlesting stopper, and for the reason, as he says, that he used to send out beer in bottles, and would have to give to each customer a piece of iron to open the bottle, which was liable not to be returned, and he says that for this reason he tried to make a stopper that would suit him better. Yet the new structure could not have been a satisfactory one to be used for the purpose of replacing corks, or in lieu of adopting the Schlesting stopper, and to be sent out with bottles of beer, or Otto would have had more of them made, and would have put them to the use of transportation. The original specification of De Quillfeldt says that his stopper is to close bottles in a "secure" manner, as well as in a quick and convenient manner, and that, when closed, the "stopper is seated so firmly on the bottle that no accidental detachment in handling is possible." The re-issue says that the bottle mouth is "securely closed" and "tightly" closed. It is not shown that this structure of Otto's closed the bottle mouth securely or tightly. Unless this was done the structure was useless. The evidence on this subject is entirely wanting. Otto says that he used the structure in his saloon, and that it worked "good." He gives this account of the way in which he used the structure in his saloon: "I filled the bottle with Rochester beer. I used to pour out one glass from it to a customer and enclose it again and place it on the table. Either they would pour out the second glass themselves, or, if they couldn't open it, I would show it to them, and pour out a second glass, too. Then, when I bottled beer again, I filled it again and sold it as before." This structure he says he so used for two years

from the spring of 1874. For three years from 1876 it stood unused under his counter. Sometime in 1879—the piece of India-rubber on the stopper having before that time been lost from it, but when or where does not appear—the bottle and what remained of the structure, in the state in which they are now presented, were put into an old trunk out of doors, under stairs leading from the saloon to the yard, with other bottles for which he says he had no use, and which he placed in the same trunk at the same time. There it remained until September, 1879, when the defendant Fritz Hollender accidentally learned about it from Otto. Fortenbach says that Otto had Schlesting stoppers and opened them with a separate lever before he, Fortenbach, saw the Otto stopper at Otto's saloon in the spring of 1874; and that Otto then said to him, in reference to the latter, that it was handier than using the separate lever. It undoubtedly was, and the new stopper was one to instantly replace corks; and the Schlesting stopper, if a complete and perfect stopper, capable of closing the bottle securely and tightly, for handling and transportation. Otto was a locksmith, and had a locksmith's shop on his premises, and with the same tools with which he had made this structure he could have readily made others like it, if this were a successful bottle-stopper, in the sense above stated. All that Fortenbach says about it is that, according to his judgment, it worked well. Kern says it worked well, and was better than all the corks they had before, and that before they had it they had nothing but corks. Krause says that it seemed to operate "good." Giebner says that it operated "quite well," and that the rubber closed it "quite well." The above is all there is from the witnesses who saw the structure that gives any idea as to the effectiveness of the stopper. The evidence is wholly defective and insufficient. But, besides, the testimony as to a trial now of a structure made on the part of the plaintiffs as nearly as possible like the original structure, with a disk of rubber slightly thinner and rather more flexible than the rubber disk which Otto says he used, and the testimony as to the

appearances visible in and absent from Otto's structure, as
bearing on the question of the strain to which it has been
subjected, and the testimony as to Exhibits A and B, intro-
duced by the defendants as duplicates made now of Otto's
structure, and my own examination of that structure, in con-
nection with all the evidence before alluded to, and with the
whole testimony in the case, lead to the conclusion that Otto's
structure was not an anticipation of the De Quillfeldt inven-
tion.   If it had the use which Otto says it had, it never was
subjected to the strain necessary to close the bottle securely
and tightly, sufficient for handling and transportation, and it
amounted only to an experiment, which was abandoned.
The whole evidence shows that it must fall into the rank of
abandoned experiments.   To no one of those who saw it, nor
to Otto himself, did it suggest the idea of being a stopper
which was fit to use on bottles which were to be sent out with
beer.   It failed to do so, if used as long and as often as Otto
says it was, because it was not in such a state as to close the
bottle securely and tightly.   It failed to do so, equally, if not
used as long and as often as Otto says it was.   The defend-
ants have not shown that the invention was complete, and
capable of producing the result sought to be accomplished,
—the result accomplished by the De Quillfeldt device.   The
thing was inchoate, and rested in experiment.   The process
pursued for its development failed to reach the point of con-
summation.   However nearly Otto approximated to the end in
view, he only made progress.   The world derived no benefit
from what he did.   The recollection of it was stimulated by
the success of De Quillfeldt's invention.   But for that Otto's
structure would have still been reposing in the old trunk
beneath the stairs, forgotten and worthless.   The substantial
form in which Otto clothed his conception, so far as it is pre-
served, and so far as its original arrangement and operation
can be understood, does not demonstrate that it had the
practical efficacy and utility which characterize the De Quill-
feldt stopper.   Otto's work was not complete, and he gave
nothing to the public.

These views apply to all that there was in Otto's structure. It was a unit. It was an abandoned experiment as a whole. It cannot affect any one of the claims of the plaintiffs' patent.

There must be a decree for the plaintiffs for an account of profits, and an ascertainment of damages, and a perpetual injunction, in accordance with this decision, with costs.