## KITTLE v. HALL and others.

*(Circuit Court, S. D. New York. January 3, 1887.)*

1. PATENTS FOR INVENTIONS—INFRINGEMENT—PATENT NO. 98,505—CLAIMS 1, 2, AND 3—PATENT TO JAMES I. SPENCER.

    Letters patent No. 98,505, granted to Samuel P. Kittle, January 4, 1870, for an improved spiral spring for mattresses and furniture, as limited to the first two claims under such patent, are valid; and the patent granted to James I. Spencer, July 24, 1877, for an improvement in spring bed bottoms, is an infringement upon them. The third claim, for a flexible border of rattan at-

tached to the outer edges of the springs as a support to keep the ticking in line. in combination with the springs, frame. webbing, etc., is not valid for the reason that it was inserted more than four years after the application was filed. and more than two years after the structure covered thereby had gone into public use.

2. SAME—SEVEN YEARS' DELAY—NOTICE TO DEFENDANTS—NO DEFENSE.

In an action for infringement of letters patent, where it is shown that defendants took a license from plaintiff to make and vend the patent, and subsequently denied plaintiff's rights. and claimed to make under another patent; that shortly after such denial plaintiff became bankrupt, and the assignee in bankruptcy sold the patent after two years; that plaintiff entered into negotiations to get the patent back from the vendee; that, though the vendee took no steps to prevent the patent being plundered, plaintiff gave defendants notice he intended to hold them accountable for their infringements; that, after his discharge from bankruptcy, and when he had reacquired the patent, plaintiff commenced action against defendants for infringement,—the court, sitting in equity, will, considering all the circumstances, take jurisdiction of the cause. notwithstanding a delay of about seven years in the prosecution by plaintiff of his rights.

In Equity.

*James P. Foster*, for complainant.

*James A. Whitney*, for defendants.

COXE, J. This action is for the infringement of letters patent No. 98,505, granted to the complainant January 4, 1870, for an improved spiral spring for mattresses and furniture. The double cone or hourglass spring is constructed by having one or more of its central coils wound at right angles to its axis, instead of spirally, as before. When several of these springs are used, as in a mattress, for instance, the central coils are all on the same horizontal plane, so that when strips of cross-webbing, fastened to a suitable frame, are passed between the coils, the springs are held firmly in a vertical position.

It is asserted by the patentee that prior to his invention the spring in use could not be successfully supported in the middle, or held in a vertical position. It had a tendency to "bag out." The specification provides for a slight wooden frame to support the webbing and the springs. The webbing, having its ends secured to this frame, is passed through and fastened to the central horizontal coils, each strip of webbing passing alternately over and under the strip crossing at right angles. The middles of all the springs are thus held in the same relative position, their full elasticity is preserved, and durability is assured.

The claims are as follows:

"(1) A spiral spring, for use in mattresses, furniture, etc., so constructed that its central coil or coils are wound at right angles to its axis, substantially as and for the purposes set forth.

"(2) The combination of a spiral spring, when constructed as described, with the cross-webbing, C, C, and frame, D, or their equivalent, when arranged to support such spring, substantially as and for the purposes set forth.

"(3) In a spring mattress, having the springs supported from or at their centers, the arrangement of a rattan or a like flexible border, attached to the outer edges at bottom and top of the outside rows of springs, to furnish a suitable support to keep the ticking in line, but which will also yield as any spring or part of the mattress is compressed."

The defenses are—*First*, that the complainant has no title to the patent; *second*, that he is guilty of laches; *third*, abandonment; *fourth*, lack of novelty; *fifth*, non-infringement.

To the. third claim several distinct and separate defenses are urged, which will be stated hereafter.

There is no flaw in the complainant's title. On the thirty-first of December, 1877, he was forced into bankruptcy. The adjudication vested the title in the court. On the eleventh of April, 1878, the register in charge assigned all the property, as provided by law, to De Witt C. Weeks, the duly-appointed assignee. On the twenty-eighth of January, 1879, Weeks sold and assigned the patent to Francis C. Devlin. Six days thereafter Devlin assigned it to Theodore Wilkins, who held it until the eighth day of October, 1884, when it was transferred by him to the complainant. On the fourth of October, 1878, the complainant was discharged in bankruptcy by the district court. The chain of title is perfect. No valid accusation can be made against it.

The proposition that the bill cannot be maintained because of the laches of the complainant is a most perplexing one. The solution of it has been rendered more difficult from the fact that the complainant's brief, so full and exhaustive upon other branches of the case, makes only casual and passing allusion to the question, which is elaborately presented upon the brief of the defendants. The facts bearing upon this question are as follows:

In the autumn of 1865 the patentee conceived the invention. On the fourth of January, 1870, the patent was granted. In February, 1885, 15 years thereafter, this action was commenced. In 1875 a suit for infringement was commenced against one James V. Schenck, but the proofs were not completed, and it was never brought to a final hearing. No step appears to have been taken in it after July, 1877. No other action was at any time commenced. In the autumn of 1877 the defendants commenced·making the infringing mattresses. They were made under a patent granted to James I. Spencer, July 24, 1877, for an improvement in spring bed bottoms. In November, 1877, the defendants issued a circular to the trade, in which they insisted, in most vigorous and uncompromising language, upon their right to manufacture under the Spencer patent, and closed with these words:

"We have only to say in conclusion that Mr. Kittle must do one of two things,—he must stop interfering with our business, or he must bring suit upon his patent, and thus give us a chance to see how little it amounts to. If he does not do one thing or the other of these, he will soon find himself defendant, instead of plaintiff, in a lawsuit."

The complainant appears to have chosen the first of these alternatives; for from that time until this suit was commenced there was no more interference with the defendants or their customers, except, he testifies, that he told the defendant Hall, in April, 1882, that a day of reckoning was approaching, and he wished him to keep a strict account of his sales.

From December, 1877, neither the complainant, nor any of the intermediate owners of the patent, has manufactured or asserted any right

under it, except as before stated. The assignees, with the exception of Mr. Devlin, who held the patent but a short time, all knew of the infringement, by the defendants not only, but by the trade generally, and yet they made no move to prevent it, though frequently urged to do so. In short, the patent, from the fall of 1877, has been pirated upon by the whole trade. Since then no one has respected it. On the fourth of February, 1876, the defendants, then doing business at Philadelphia, took from the complainant a license to make and vend the patented mattress in that city for one year. The license provided that, in case of the failure of the defendants to perform the conditions of the license, the same was to become null and void, and all rights and privileges under it to cease and determine.

These are the facts. Bearing in mind the theory upon which equity takes cognizance in patent causes, as established by the decision of the supreme court in *Root* v. *Railway Co.*, 105 U. S. 189, it becomes important to ascertain what the law is as applicable to these facts. The accumulated wisdom of a multitude of precedents has established the principle that he who invokes the protection of a court of equity must be "prompt, eager, and ready" in the enforcement of his rights. Equity will not encourage a sleepy suitor. As time passes, memory fails, witnesses die, proof is destroyed, and the rights of individuals and of the public intervene. Long acquiescence and laches can only be excused by proof showing excusable ignorance, or positive inability to proceed on the part of the complainant, or that he is the victim of fraud or concealment on the part of others. A mere "imaginary impediment or technical disability" is not enough. The court will not entertain a case when it appears that the complainant, or those to whose rights he has succeeded, have acquiesced for a long term of years in the infringement of the exclusive right conferred by the patent, or have delayed, without legal excuse, the prosecution of those who have openly violated it. These propositions are, it is thought, abundantly sustained by the following authorities: *Piatt* v. *Vattier*, 9 Pet. 405; *Wyeth* v. *Stone*, 1 Story, 273; *McLaughlin* v. *People's Ry. Co.*, 21 Fed. Rep. 574; *Speidell* v. *Henrici*, 15 Fed. Rep. 753; *The Fleming*, 9 Fed. Rep. 474; *Estes* v. *Worthington*, 22 Fed. Rep. 822; *Barden* v. *Duluth*, 28 Fed. Rep. 14; *Wagner* v. *Baird*, 7 How. 234; *City of Concord* v. *Norton*, 16 Fed. Rep. 477; *Badger* v. *Badger*, 2 Wall. 87; *Wollensak* v. *Reiher*, 115 U. S. 101; S. C. 5 Sup. Ct. Rep. 1137; *Brown* v. *County of Buena Vista*, 95 U. S. 157; *Lansdale* v. *Smith*, 106 U. S. 391; S. C. 1 Sup. Ct. Rep. 350; *Godden* v. *Kimmell*, 99 U. S. 201; *Maxwell* v. *Kennedy*, 8 How. 210; *Sperry* v. *Ribbans*, 3 Ban. & A. 260; Curt. Pat. §§ 440, 441; Walk. Pat. §§ 596, 597; Pom. Eq. Jur. §§ 418, 419.

In the present case it is argued with considerable plausibility that the complainant, from the date of his patent until the commencement of this action, with the exception of the abortive and abandoned suit against Schenck, has made no active effort to stop infringements, although they commenced before the patent was issued, and continued, with the knowledge of the complainant, until they were well-nigh universal; that the

public had a right to assume, from this profound silence and supineness, that the patentee and his successors had relinquished any claim which they might possess. The complainant seems to proceed upon the theory that, if it can be shown that he personally is free from negligence, it is sufficient, and that he shows this when it appears that the title passed out of him when he was adjudicated a bankrupt, and that when he obtained it again in October, 1884, he used due diligence in prosecuting infringers.

The proposition, stated thus broadly, cannot be maintained. A party who purchases a patent which has for years been freely plundered by a multitude of trespassers does not answer the charge of laches by showing that he commenced, immediately after he acquired title, to bring the wrong-doers to account. Such a fact is of no more interest to a defendant sued for infringement than the fact that the last holder of an outlawed note brought an action upon it without delay, is to the maker of the note. But, so far as these defendants are concerned, it cannot be maintained that there was any laches until they stood out from under their license, and boldly proclaimed their purpose to continue the manufacture under the Spencer patent. This was in November, 1877. A month later the complainant was in bankruptcy. It was not until the eleventh of April, 1878, that the patent was transferred to the assignee in bankruptcy. He held the title until the twenty-eighth of January, 1879. During this period, when the patent was in the court of bankruptcy, negligence can be imputed to no one. For several months the title was suspended, and no action could have been maintained; and, as to the remaining time, it cannot be maintained that it is the duty of an assignee in bankruptcy to institute suits for the infringement of a patent owned by the bankrupt, and that his failure so to do is negligence.

Wilkins held the patent from February 3, 1879, until October 8, 1884, and no valid reason is discovered in the record why he could not have made some effort to prevent the patent from being plundered. It appears, however, that the complainant early commenced negotiations with Wilkins looking to a reassignment of the patent, and that in April, 1882, the defendant Hall had notice that the complainant still asserted its validity, and intended to hold him to a strict account.

Furthermore, it is entirely clear that, whatever may be said as to other manufacturers, the defendants were not misled. The defiant challenge of their circular leaves no doubt that they had made up their minds as to the course to be pursued, and that they did not intend to desist unless prevented by the command of the court. So the simple question is, will equity refuse to entertain a cause where, in the circumstances disclosed by this record, there has been a delay of about seven years in its prosecution? The question is an interesting one, and is by no means free from doubt; but it is thought, taking into consideration the fact that the delay has been partially accounted for and excused, that the case is in some respects *sui generis*, and that no precedent has been discovered for the dismissal of a bill for laches extending through so short a period; that it should be answered in the negative.

It is entirely clear that the invention must be confined to what is covered by the first and second claims. The accusations urged against the third claim are so numerous that it will be impossible to consider them all. It is said that the drawings which relate to it are defective; that the subject-matter of the claim was abandoned to the public; that no application was ever filed for the invention which it covers; that it is for a mere aggregation, and not for a patentable combination; and that it is void for uncertainty. It is by no means an easy task to place an intelligent construction upon this claim. The expert witnesses do not agree as to what it includes, and in one instance, at least, the same witness, when he is again called to testify, greatly modifies his first opinion regarding it. It may be said that, if the broad construction suggested is adopted, the claim is anticipated; if the narrow one is taken, the defendants do not infringe.

But the manner in which the claim found its way into the patent was irregular, and, it would seem, illegal; and the public acquired vested rights in the invention covered by the claim years prior to its first appearance in the patent-office. The application was filed November 28, 1865. It recites that the petitioner has invented, not a new mattress, but a new improved spiral spring, and prays that a patent may issue therefor. No other application was ever filed. The patent, when issued, was for a spring alone. The claims of the original specification—three in number—related only to the spring, and the "former" on which it was constructed. The application was rejected. A year later, the patentee, after correspondence with the commissioner, forwarded amendments omitting the claim for the "former," and substituting the present second claim for the proposed third claim; so that the patent then had but two claims,—the first and second as they now appear. On the tenth of December, 1866, the application was re-examined, and again rejected. Nothing more was done until November 22, 1869, when a request was made by the complainant, through his solicitor, for a re-examination of the case. This was granted, and the patent allowed about the twenty-seventh of the same month. Three weeks thereafter, on the seventeenth of December, 1869, the solicitor wrote the commissioner proposing, if it was not too late, that the present third claim should be inserted. It was inserted.

So far as appears from the file-wrapper, the attention of the patent-office was never called to the third claim until December, 1879, and then only by this letter of the solicitor. For more than two years prior to the first suggestion of this claim, mattresses, embodying all its elements, were, with the knowledge and consent of the complainant, bought and sold in the open market. In this connection it is worthy of comment that one of the defendants testifies that the complainant repeatedly informed him, in substance, that his invention was confined to the spring, and the mode of fastening it, and that the third claim could not stand the test of a judicial examination. This testimony is not denied.

Assume that the patent had been granted in 1865 for a spring as prayed for, and on the seventeenth of December, 1869, four years later, the

complainant had petitioned for a new or reissued patent covering the combination of the third claim, it needs no citation of authorities to prove that such a proceeding would not have been received with favor by the court; and yet how is the position strengthened by an attempt to graft the invention upon an application which will not sustain it, especially when it is shown that during the interval the invention went into public use?

In *Railway Co.* v. *Sayles*, 97 U. S. 554, Mr. Justice BRADLEY, at page 563, says:

"It will be observed that we have given particular attention to the original application, drawings, and models filed in the patent-office by Thompson and Bachelder. We have deemed it proper to do this, because, if the amended application and model, filed by Tanner five years later, embodied any material addition to or variance from the original,—anything new that was not comprised in that,—such addition or variance cannot be sustained on the original application. The law does not permit such enlargements of an original specification, which would interfere with other inventors who have entered the field in the mean time, any more than it does in the case of reissues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alterations, or to appropriate that which has, in the mean time, gone into public use."

See, also, *Eagleton Manuf'g Co.* v. *West, etc., Manuf'g Co.*, 111 U. S. 490; S. C. 4 Sup. Ct. Rep. 593; at circuit, 2 Fed. Rep. 774; *Planing-machine Co.* v. *Keith*, 101 U. S. 479; *Fruit-jar Co.* v. *Bellaire, etc., Co.*, 27 Fed. Rep. 381; *Lindsay* v. *Stein*, 10 Fed. Rep. 913; *United States Rifle, etc., Co.* v. *Whitney Arms Co.*, 14 Blatchf. 94; *Consolidated Fruit-jar Co.* v. *Wright*, 12 Blatchf. 149; affirmed, 94 U. S. 92; *Bevin* v. *East Hampton Bell Co.*, 9 Blatchf. 50.

It is asserted that the invention, confining it to the spring and the means of fastening it, is void for lack of novelty. The proof shows that prior to the patent it frequently happened that double cone springs, made of iron wire, which was then in use, "broke down" in the center. This occurred from accident or want of skill in the maker. When, in this condition, they were regarded as second-class or damaged springs, and were sold as such for use in cheap and inferior furniture, the central coils, which thus happened, in some instances, to be at right angles to the axis of the spring, were not of the same size, so that when in use the smaller coil would frequently pass through the larger, thus causing the spring to rattle. These springs did not break down in the same place, and were incapable of performing the functions of the patented spring, even if any one had thought of putting them to this use; but no one ever did. Neither the damaged springs, nor the French patent, nor any of the other references, is sufficient to defeat the patent. The evidence all falls far short of that clear and convincing proof which is required in such cases. *Coffin* v. *Ogden*, 18 Wall. 120; *Coburn* v. *Schroeder*, 19 Blatchf. 377; S. C. 8 Fed. Rep. 519; *Webster Loom Co.* v. *Higgins*, 4 Ban. & A. 88; *Herring* v. *Nelson*, 14 Blatchf. 293; *Wood* v. *Cleveland Rolling-mill Co.*, 4

Fish. 550; *Putnam* v. *Hollender*, 19 Blatchf. 48; S. C. 6 Fed. Rep. 882; *Howe* v. *Underwood*, 1 Fish. 160; *Clough* v. *Barker*, 106 U. S. 166; S. C. 1 Sup. Ct. Rep. 188.

The defendants infringe. The Spencer spring used by them is constructed with a vertical bend or bearing loop at the central axis of the spring. This bend or pin passes through a metallic eyelet in the webbing. The spring is so wound that on either side of the webbing there is a horizontal, or nearly horizontal, coil, at right angles to the axis of the spring, which helps to support the spring in a vertical position. A portion of the central coil is wound at right angles to the axis, and there is a level bearing of the spring upon the webbing. It is quite likely an improvement, but, nevertheless, it performs all the functions of the patented spring.

The questions argued relating to the amount of damages and profits can best be considered upon the coming in of the report of the master.

The complainant is entitled to decree for an accounting upon the first and second claims of the patent.