AMERICAN FIBRE–CHAMOIS CO. v. PORT HURON FIBRE–GARMENT MANUF'G CO. et al.[1]

(Circuit Court of Appeals, Sixth Circuit. February 10, 1896.)

No. 350.

1. PATENTS—CONSTRUCTION—FIBRE-CHAMOIS PAPER.
    The McLauchlin patent No. 511,789, for an improved process for the manufacture of imitation dressed chamois buckskin from paper pulp in sheets, if valid at all, is limited by the prior state of the art, and by the language of the original specifications and of the patentee's prior Canadian patent, to the crumpling and pounding of the paper when moistened with a thin solution of gelatin, or other adhesive solution, and is not infringed by treating in a similar manner paper moistened merely with water.

2. SAME—MISCONDUCT OF PATENT OWNER.
    The action of a patent owner in harassing purchasers with threats of litigation, when no possible ground of action exists against them, even if the patent is valid; in attempting to dismiss his bill, whereby defendant, in order to prevent it, is compelled to file a cross bill; and in delaying the taking of evidence until after defendant begins the taking of testimony,—is not such as commends the cause to a court of equity.

Appeal from the Circuit Court of the United States for the Southern Division of the Eastern District of Michigan.

This was an appeal from a decree dismissing a bill to enjoin the infringement of the same McLauchlin patent just considered in the last case. American Fibre-Chamois Co. v. Buckskin-Fibre Co., 72 Fed. 508. In the present case, however, the issues were made, not by demurrer to the bill, but after full pleadings and proof. The process described in the McLauchlin specifications, as the patent was granted, are comprised in the following steps: First,

[1] Rehearing denied April 14, 1896.

moistening the sulphite fibre with a solution of gelatin, 20 parts water to 1 of gelatin; second, crumpling the fibre; third, pounding the same in changed positions; and, fourth, smoothing and drying the moist, crumpled, and pounded sheets. The patentee says: "The wood fibres, which, if dry, would break and disintegrate under pounding, readily bend when moist, and retain their integrity. The small percentage of gelatin also materially serves to promote this action, but I do not limit myself to this ingredient." The first claim is for the process of "first moistening and then pounding said sheets while in a moist condition, substantially as described." The second is for "first moistening the sheets with a solution of gelatin, and then pounding said sheets while in a moist condition." McLauchlin took out a patent in Canada in 1890. In that his description of the process was as follows: "The sulphite fibre or sheet * * * is dampened with gelatin (or similar adhesive) solution, to prevent disintegration of the fibre, and then beaten with a suitable pounding instrument or machine to soften the material by breaking down or crushing the harshness formerly existing, and subsequently the pounded fabric may be smoothed between heated rollers to finish and dry the material." The first claim was for pounding the fibre sheet in a damp state, saturated with liquid gelatin; and the second was for dampening the sheet with liquid gelatin, then crushing the fibre by pounding, and finally passing the sheet between heated rollers. This was also the form of the original application and claims filed in the United States patent office October 12, 1891. On the 8th of April, 1892, the patentee was required to state the strength of the gelatin solution. This was accordingly stated, but the application was nevertheless rejected. In his letter to the commissioner asking a reconsideration, McLauchlin said that the essence of his process was embraced in "two steps, and no more, and those steps are — First, the saturation by the liquid gelatin; and, second, the pounding while in a damp condition." A second rejection followed. Finally, on May 23, 1893, the application as filed was all stricken out, and specifications and claims like those in the patent as issued were inserted, and the patent was granted January 2, 1894. The R. C. Mudge Paper-Clothing Company began in 1889 to make paper garments. The material was sulphite fibre softened and made pliable by hand rubbing. Subsequently sets of corrugated rollers, with the corrugations lengthwise of the roller, were used. The sulphite fibre was passed once through these rollers in the damp condition received from the manufacturer, and then it was subjected to rubbing. The business was not successful, and the property, including unsold stock of the company, was sold under a mortgage. The Port Huron Paper-Clothing Company in 1890 succeeded to the unsold stock and business of the Mudge Company. McLauchlin had been employed as a salesman by the Mudge Company, and was again employed by its successor. Complainant's evidence tends to show that, after this company had been some little time in the business, McLauchlin, in July, 1890, suggested the erection of some pounding machines in which the sulphite fibre, in a damp and crumpled condition, was subjected to a spring-controlled pounding. No gelatin was used in the dampening. McLauchlin shortly afterwards left the employ of this company. This second venture also proved a failure. The Port Huron Paper-Clothing Company some time thereafter leased its property and good will to the defendant company, which continues to use the old pounding machines, and has built 12 more. The defendant also makes the same product by running the moist fibre, as it comes from the manufacturer and folded a dozen times, between corrugated rollers held together by a spring. It does not use gelatin in any form to dampen the sulphite fibre. In the fall of 1894 the style in ladies' dresses required full, or balloon, sleeves, and the material made by complainant and defendant was well adapted as a lining to give the sleeve the desired form. At the same time hair cloth, for which this material seems to furnish a very fair substitute for use as skirt and dress lining, rose greatly in price. The complainant company in 1894, for the first time, put its product on the market. It was sold in 10-yard sheets, done up in the usual sheeting bundle. Prior to this the material had only been sold by the Mudge Company and its successors in cut and sewed garments. Defendant at once adopted the same

form of the sheeting package. The demand has exceeded the supply, and the consumption has been more than 30,000 yards daily. The circuit court dismissed the bill on the ground that the patent was for a process of pounding crumpled paper dampened in a gelatin solution, and the process of the defendant did not involve the use of gelatin, or any similar solution, to moisten the paper.

M. B. Philipp and M. H. Phelps, for appellant.

Geo. H. Lothrop, for appellees.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge, after stating the facts, delivered the opinion of the court.

McLauchlin's original application in Canada and in the United States mentioned but two steps. One was the dampening with gelatin, or similar adhesive solution, and the other was the pounding to crush the fibre. No mention was made of crumpling. Not until May 23, 1893, did the patentee describe crumpling as one step in his process. The witnesses for complainant all say that, with the crumpling step omitted, the process would be a failure. Now, it is conceded that in 1890 the Port Huron Paper-Clothing Company was publicly using, with McLauchlin's knowledge and consent, a process of pounding moist, crumpled, fibre sheets, and the same process now used by defendant. Unless, therefore, the crumpling was in some way included in the process described in the original specification, there was danger, under the decisions in Globe Nail Co. v. Superior Nail Co., 27 Fed. 450, 454, and Kittle v. Hall, 29 Fed. 513, that the application for the process patented must be treated as filed May 23, 1893, and more than two years after the process as patented (if that includes dampening with water only) had been in public use in this country, and that thus the patent would be avoided. To obviate this danger the appellant makes the following admission in the brief of its counsel:

"That it was known in the art that the manipulations involved in the crumpling of paper, and pounding it in a crumpled condition, had a tendency to soften it, is not denied by the appellant; but, on the contrary, it appears that such is the fact, not only from the testimony of Prof. Main, but from that of Mr. Julius Hess, at one time a paper manufacturer, and manager of the Michigan Sulphite-Fibre Company, at Port Huron. Mr. Hess described the effect of pounding paper when it is crumpled by stating that it loosens the interior fibres; that this loosening of the interior fibres is accompanied by the separation of the skins of the paper; that because of this loosening, which remains after the treatment, the paper is rendered flexible. He also says that the effect of such manipulations upon paper has been familiar to him ever since he went into the paper business; that is, he had this knowledge from his general observation of the action of paper under various manipulations at his factory. This was, however, with this witness, as with other paper manufacturers, merely theoretical knowledge, which had never been put to useful application. He did not know prior to the McLauchlin invention that moistened paper could be pounded in a crumpled condition, and thus be rendered soft and pliable, without materially lessening its strength, and that knowledge was not within the ordinary skill of a paper manufacturer prior to the McLauchlin patent."

The validity of the patent is thus rested on the novelty of dampening the fibre before its treatment. The question, therefore, is whether

it was known to the art that the moistening of the fibre would facili-
tate and aid in the softening of paper by crumpling and pounding,
without injury.   We think the patents in this record, the evidence,
and the concessions of counsel at the argument, show clearly that it
had been known, prior to McLauchlin's conception of his process,
which he fixes as in 1889, that paper might, without injury, be
crinkled or crumpled in a softening process while in a moistened state,
and that the dampness aided the process.   Thus, it appears without
contradiction in this record that the Mudge Company, as one step in
its process, passed paper moistened with water through corrugated
rollers, and that the result was more satisfactory when the paper was
moist than when it was dry.   The Seymour Scott patent, of June,
1879, was for the product of a process by which heavy paper was to
be passed through suitable breaking stamps or rollers, so as to render
it limp and flexible, while the paper was yet in the paper machine.
Now, it appears by admission of counsel at the hearing and from the
circumstances disclosed in the record of Mudge's experiments, that
paper in the paper machine is always moist, so that the Scott
patent contained the suggestion of that which is claimed to be
the novelty of McLauchlin's patent.   It is difficult to see why, if
moisture aided the softening process without destroying the fibre
when subjected to the crushing of corrugated rollers, it was not obvi-
ous that the same result would follow in the use of moistened paper
when subjected to pounding and crumpling; for the effect of the latter
on the surface of the paper was certainly not more likely to be vio-
lent and injurious than that of the former, if we credit the state-
ments of complainant's witnesses as to the breaking and straining of
the paper's surface caused by corrugated rollers.   It thus follows
that, if the patent in suit includes a process of pounding crumpled
paper dampened with water only, it is void for want of novelty.   In
order, therefore, to give the patent any validity, it is necessary to re-
tain in the process it describes the use of gelatin, or other adhesive
solution, and we concur with the court below in holding that the pat-
ent and its claims cover only a process in which the paper is dampened
with such a solution.   This was the process, as applied for.   The
process, as patented, describes the use of a gelatin solution only; but
the specification, after a reference to the effect of the small percent-
age of gelatin, contains the words, "but I do not limit myself to this
ingredient."   We think these words, in view of the language of the
original application and of the Canadian patent, must be construed
to be the equivalent of the words of enlargement used therein, i. e.
"other adhesive solution."   The first claim is for moistening and
pounding "substantially as described."   The second is for moistening
with a solution of gelatin, and pounding.   The first claim includes
moistening with any adhesive solution.   The second is confined to
a gelatin solution.   As the defendant does not use gelatin, or any
adhesive solution, it does not infringe.   We have no hesitation in
thus construing this patent strictly, both because it is necessary to
sustain the patent at all, and also because we think the patent has

little merit, in view of common knowledge and the prior art. We do not discover, in spite of the considerable evidence in the record of its existence, that great difference in character between the old Mudge Company's product and that of complainant. We think the sudden and peculiar demand for some material of this kind in the sheet form in which it was put upon the market in 1894 explains its great sale, rather than any marked improvement in its mode of manufacture. Nothing herein is intended to decide that the patent, as construed above, is valid. That question does not here arise. All we decide is that, unless it is construed as above, it is not valid.

The conduct of the complainant in harassing purchasers of the product of this process with threats of litigation, when no possible ground for an action existed against them, whether the patent be valid or not (Goodyear v. Railroad Co., Fed. Cas. No. 5,563; Boyd v. McAlpin, Id. 1,748; Brown v. District of Columbia, 3 Mackey, 502; 3 Rob. Pat. 927), savors of an attempt to use the process of the courts to win customers by unfair means, and thus to reap a harvest that must be of limited duration. It does not indicate that confidence in the validity of the patent which presses to a full investigation of rights, and a comprehensive and decisive conclusion. In the case at bar, complainant attempted to dismiss its bill after the cause was at issue. In order to prevent this, and secure a hearing and decision of the case, defendant was compelled to file a cross bill. Complainant took no evidence until after defendant had begun the taking of its evidence. Such a course certainly does not commend the cause of a suitor to a court of equity. The decree of the circuit court dismissing the bill is affirmed, with costs.