## TRIPLEX SAFETY GLASS CO. OF NORTH AMERICA v. KOLB.

No. 6163.

District Court, E. D. Pennsylvania.

Nov. 12, 1931.

Redding, Greeley, O'Shea & Campbell and Drury W. Cooper, all of New York City, and Wm. M. Hussie, of Philadelphia, Pa., for plaintiff.

George I. Merrill and Rudolph M. Hunter, both of Philadelphia, Pa., and Thomas G. Haight (of Wall, Haight, Carey & Hartpence), of Jersey City, N. J., for defendant.

KIRKPATRICK, District Judge.

The patent upon which this suit in equity for infringement has been brought is United States patent No. 1,182,739, applied for June 14, 1911, and issued May 9, 1916, to Edouard Benedictus for the manufacture of laminated glass, ordinarily known as non-shatterable or shatter-proof glass. The first eleven claims are process claims and are not in issue. The twelfth claim is for a product and is as follows: "As a new article of manufacture, a sheet of celluloid faced on both sides and in the order named by sheets of gelatin and glass, all rigidly and autogenously united together, and the gelatin being substantially free from contained moisture, as described."

The validity of this claim was established in a suit brought by this plaintiff against Duplate Corporation in the Western District of Pennsylvania, on December 31, 1928, and decided November 15, 1929. The decree of the District Court was affirmed by the Circuit Court of Appeals for the Third Circuit on July 16, 1930. The two opinions are reported in 42 F.(2d) at pages 737 and 739, respectively.

In view of the prior adjudication, the only issues in this case which need be considered are infringement and laches.

### Infringement.

In the Duplate Case the court recognized the fact that the use of gelatin was not new. Wet gelatin had been used and had produced adhesion between the glass and the celluloid, but the result was a smeared and cloudy product of no commercial value. The court found the essence of Benedictus' invention to lie in the use of gelatin from which the moisture had been substantially extracted.

Of course, this interpretation required as a basis a fact finding that gelatin "substantially free from contained moisture" under heat and pressure and without the use of other agents would of itself produce satisfactory adhesion, for the claim requires all elements to be autogenously united.

The defendant in the present case attacks this basic fact finding as wholly erroneous and has produced new evidence in support of his position. By experiments in the courtroom he demonstrated that gelatin from which moisture has been extracted until less than a certain percentage remains is not thermoplastic; that is, will not become sticky upon being heated. He also showed that gelatin containing 30 per cent. or more of moisture will. In order that the defendant may have the benefit of what I am convinced is the fact, I find that gelatin in itself is not thermoplastic, but that it becomes so only after the addition of water of an amount which need not now be determined.

It is to be noted that the experiments did not involve pressure and no finding can be made as to whether or not perfectly dry gelatin or gelatin having less than say 5 or 10 per cent. of water becomes sticky under the combined influence of both heat and pressure. However, I think it quite probable that it does not, and, without making a finding to that effect, I will assume that it does not.

The argument is that if "substantially free from contained moisture" means substantially dryer than the gelatin of commerce, commercial safety glass cannot possibly be produced under the patent; and, unless the use of some agent in addition to the gelatin be incorporated in the product claim by reference to the process claims and specification, the patent is inoperative and the claim void for want of utility. The plaintiff, the defendant says, gets adhesion for his product by introducing alcohol, which acts as a solvent, not upon the gelatin, but upon the celluloid and produces upon it sticky surfaces which are just as satisfactory for binding as plastic gelatin.

Now of course, if the phrase "the gelatin being substantially free from contained moisture" does call for gelatin dehydrated appreciably beyond the ordinary gelatin of commerce, this argument would have to be very seriously considered, and I would want additional evidence in order to ascertain

whether heat and pressure combined will accomplish what heat alone will not do.

But the Circuit Court of Appeals has held that the gelatin of the patent need be dehydrated only to the point where it becomes dry to sight and touch and, according to the testimony of one of the defendant's witnesses, this point is reached though the gelatin still retains as much as 30 per cent. moisture (though other witnesses placed it as low as 17 per cent.). The court's interpretation deals only with the upper limit of the moisture content and is not concerned with the lower limit. In substance, the court said that the prior art thought that a great deal of water was necessary to get proper adhesion and that Benedictus found out what no one else had discovered—that you could, without impairing the adhesion, reduce the water to a certain maximum which would not spoil the product. Under this interpretation it may well be that the moisture remaining in the gelatin has a great deal to do with obtaining adhesion. Thus the product claim covers glass produced by the use of gelatin containing enough moisture to insure plasticity but not so much that the result will be spoiled.

The clear intent on the part of the Circuit Court of Appeals to give the patent a broad construction, and the fact that claim 12 was sustained as a product claim entirely disassociated from the process described in the first eleven claims, make it plain that the court was not concerned with the percentage of moisture in the gelatin (provided it was dry to sight and touch) or with the means by which it was brought down to that point—whether by heat or the use of a dehydrating agent or both combined.

The question arises whether I am bound to follow this interpretation. The defendant argues that the Circuit Court of Appeals could not have reached the conclusion which it did, but would have come to the view that "substantially free from contained moisture" means dehydrated beyond the ordinary dry gelatin of commerce, had it had before it in evidence the Benedictus British patent No. 10,293 of 1911. With this patent before me as new evidence, the defendant contends that I am free to adopt its interpretation and should do so.

The specification of the British patent undoubtedly mentions the fact that the gelatin which has been sprayed or flowed in a liquid condition over the glass may be left to dry before the assembly of the parts. From this the defendant argues that the patent in suit must have intended the gelatin to be dehydrated below the point which it would reach upon ordinary drying in the atmosphere, since otherwise it would have been wanting in novelty. But such intention cannot be found because the British patent nowhere suggests that the inventor had any inkling that such dry gelatin could be used under heat and pressure to effect satisfactory adhesion. On the contrary, he points out that in case the gelatin does dry a solvent must be used to make sticky. This supports rather than impairs the soundness of the court's interpretation of the claim.

I must accept the interpretation given to the patent in the Duplate Case, and as so interpreted the defendant infringes.

On the question of infringement I make the following specific findings:

### Law.

1. This court is bound to follow the interpretation of the patent in suit announced by the Circuit Court of Appeals for the Third Circuit in Duplate Corporation v. Triplex Safety Glass Corporation, 42 F.(2d) 739.

2. The phrase "gelatin being substantially free from contained moisture," in claim 12 of the patent, means gelatin dry to sight and touch, and any gelatin of whatever percentage of contained moisture which is dry to sight and touch is within the scope of the claim.

3. The product described in claim 12 is a product in which the gelatin has characteristics of dryness to sight and touch at the time the glass is finally assembled under heat and pressure.

### Fact.

1. The gelatin of the defendant's product at the time the glass is finally assembled under heat and pressure contains approximately 30 per cent. of moisture but is dry to sight and touch.

2. The product manufactured by the defendant infringes claim 12 of the patent in suit.

### Laches and Estoppel.

The patent in suit issued May 9, 1916. Thereafter for about ten years, or until the early part of 1926, it remained a paper patent only. It went through various assignments and apparently was the subject of several different attempts at financing. From October, 1917, to December, 1922, it was in the hands of American citizens and an American corporation but never passed

the promotion stage. From December, 1922, until January, 1926, it was in the hands of foreigners, a French corporation, an Englishman, and an English corporation. In 1926 it was bought by two American citizens who organized the present plaintiff and assigned the patent to it in October, 1927. The plaintiff and its predecessors began the manufacture of glass in 1926, and speedily brought the production up to a very large figure.

On December 31, 1928, the plaintiff instituted suit for infringement against Duplate Corporation, a Pittsburgh corporation which had entered into competition with it. This suit resulted in the final establishment of the validity of the patent by the Circuit Court of Appeals for the Third Circuit, on July 19, 1930.

The plaintiff notified the present defendant of infringement in August, 1929, but did not proceed against it until August, 1930, immediately after the decision in the Duplate Case, at which time this bill was filed.

Turning to the defendant, we find him in 1914 interested in a substantial amount as a stockholder in a company known as Super Glass Company, which was manufacturing laminated glass in Philadelphia. At that time there was no market for the product among automobile manufacturers. Its principal use was for eye protection purposes, largely in industrial goggles and shields of various kinds. Now and then the defendant equipped an automobile on a special order, but the automobile industry as a whole was hostile to the introduction of this improvement and did not propose to take it up until forced to do so by popular demand.

During the war the business of the Super Glass Company expanded suddenly and to an astonishing degree by reason of a number of large army contracts for goggles for use in gas masks, aviators' goggles, etc. After the war this business disappeared as quickly as it had come, and the output fell back to a moderate volume of much the same kind as before the war.

In 1920 the present defendant purchased all the assets of the Super Glass Company and continued the business as his own. He had a comparatively small plant located at Wissinoming. It is difficult to judge from the testimony the extent of his business from then until 1929. He was doing special jobs for automobiles on special orders, and selling to dealers, but had no quantity contracts. Of course, he was trying to get the glass adopted by the automobile industry, but there are no figures given us to show how much, if anything, he spent for advertising during this period.

In 1928 he moved his business to a large and modern manufacturing plant on Stenton avenue in Philadelphia. He has invested over $800,000 in plant and equipment. From the photograph submitted it is quite certain that by far the greater part of this was put into the new plant. In 1929 he got his first large contract for equipping automobiles.

It need hardly be pointed out that the doctrine of laches is not a fixed arbitrary rule, nor that its application depends upon the circumstances of each case as they are presented to the court. The study of reported decisions rarely furnishes more than a very general guide for the court.

The doctrine arises from the inequity of enforcing an equitable remedy where there has been unreasonable and prejudicial delay on the part of the plaintiff. It merges into the doctrine of equitable estoppel, but is broader than that, in that it has been applied in cases where the only prejudice to defendant which can be shown is that which the general experience of mankind shows usually to arise upon protracted delay in the assertion of adverse rights. It will not ordinarily be applied in favor of a fraudulent or even a conscious wrongdoer.

In this case the plaintiff failed to move to assert its rights against any one from 1916 until 1928, when it brought suit against the Duplate Company, and it did not notify this defendant until six months later. The year that elapsed between notice to the defendant and the beginning of this suit may be eliminated, since all parties understood that the validity of the patent was in issue in the Duplate Case. However, there is a delay of at least twelve years to be reckoned with. This, of course, includes that of the plaintiff's predecessors in title with whose inaction the plaintiff is chargeable.

During this time the defendant was engaged in building up a business the existence of which depended upon the right to make the patented product. It is, in my judgment, proper to date the defendant's connection with this business from about 1914. He was a large stockholder and actively concerned with the business of the Super Glass Company from that date, and when he bought it in 1920 he succeeded to its equitable position as well as its property and legal rights.

I am satisfied that the defendant has never been a conscious infringer. The fiction that all men know the law may be omitted

from consideration when we are endeavoring to ascertain equitable rather than strict legal responsibility and are dealing with a patent which had not yet received judicial interpretation. It may be assumed that the defendant knew of the existence of a patent which called for the use of gelatin "substantially free from contained moisture," but he also knew that his gelatin contained 30 per cent. of water, and in fact he was using a humidifying process which was specially designed to keep its content up to that point.

The plaintiff and its predecessors must have known during most if not all of this time that the defendant was producing commercially satisfactory laminated glass, at least in the rather restricted field of goggles and other industrial protective devices. Edwards, an officer of the plaintiff company, who had been interested in the glass making industry since 1917, testified that the defendant had the only concern that was making safety glass in this country at that time. It seems to me highly improbable that the defendant would have attempted to deceive him upon so simple a matter as his use of gelatin, and I find that both he and Mr. Greeley are mistaken in this. What probably was said by the defendant was that he was not using gelatin substantially free from moisture. The simplest kind of chemical analysis would have shown the presence of gelatin in the defendant's product.

The plaintiff did not begin manufacturing under its patent until 1926, or ten years after its issue. The mere fact that up to that time it had been a paper patent only does not impair the plaintiff's rights in the slightest degree, but neither does it excuse the plaintiff from its duty diligently to assert those rights.

Up to 1926 or thereabouts, the value of the patent was much less than it is to-day. During the first ten years of its life the owners were unable to interest sufficient capital to start a business in this country. The real prize which brought them into the field was the opening of the automobile field.

Just how much the defendant's efforts and expenditures had to do with this development is not easy to say. It cannot be denied that they must have contributed in some appreciable degree. In Hills v. Hamilton Watch Co. (D. C.) 248 F. 499, Judge Dickinson dealt with this phase in a somewhat similar case, and its importance is clear.

The defendant moved his business to a new and large modern plant in January, 1929. If he was ready to move at that time, most of his investment must have been made prior thereto, and of course neither the suit against the Duplate Company (December 31, 1928) nor the notice of the defendant (August 1929) could have affected him so far as that investment is concerned.

▇ I cannot find any valid excuse for the plaintiff's delay in asserting its rights under this patent and therefore hold it to be unreasonable. Window Glass Mach. Co. v. Pittsburgh Plate Glass Co. (C. C. A.) 284 F. 645. It clearly has been prejudicial to the defendant. I am satisfied that in this case the plaintiff is not entitled to any equitable relief and the bill must be dismissed.

The plaintiff cites McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828, and Menendez v. Holt, 128 U. S. 514, 9 S. Ct. 143, 32 L. Ed. 526, for the proposition that in cases of laches the court will not dismiss the bill but will merely deny the accounting for profits. That was the disposition made in those cases, but I do not understand them as laying down any general rule or as applicable to all cases whatever the particular circumstances. Although they have been cited and followed in some patent cases, it is not to be overlooked that they were both trade-mark cases, and there are reasons for granting an injunction even to a plaintiff guilty of laches in a trade-mark case which do not exist in patent cases.