## CINEMA PATENTS CO., Inc., v. WARNER BROTHERS PICTURES, Inc.

### No. 5151.

District Court, E. D. New York.

Feb. 2, 1932.

Kiddle, Margeson & Hornidge, of New York City (Henry T. Hornidge, of New York City, Melville Church, of Washington, D. C., and Herbert A. Huebner, of New York City, of counsel), for plaintiff.

Samuel E. Darby, Jr., of New York City (William E. Beatty, of Los Angeles, Cal., of counsel), for defendant.

CAMPBELL, District Judge.

This is an action in equity for damages and relief by injunction for the alleged infringement of patent No. 1,177,697, issued to Leon Gaumont, for developing, fixing, toning, and otherwise treating photographic films and prints, granted April 4, 1916, and patent No. 1,209,696, issued to Leon Gaumont, assignor to Societe Etablissements Gaumont, for apparatus for drying photographic films, granted December 26, 1916.

The jurisdictional facts and title of the plaintiff to the patents in suit and notice of infringement directed by the plaintiff to the defendant prior to the filing of suit are admitted.

The defendant has by answer interposed the defenses of invalidity, noninfringement, and laches.

The patents in suit relate to the motion picture art, and disclose a continuous process for developing motion picture film, and apparatus for carrying out that process.

The patents in suit have never been adjudicated.

Moving pictures consist physically of a series of photographs on a strip of film of considerable length, which are reproduced in such rapid succession as to give the impression of continuous action.

The method formerly pursued in developing still pictures could not be used for processing motion picture film strips.

The original system, called the rack and tank method, which has been used even down to a late date, consisted in the operator winding the film in lengths of about 200 feet on racks, and immersing them in tanks, and transferring the racks bodily from one tank to another until the developing, fixing, and washing were completed. After the washing, the film was wound on large drums in the drying room, and allowed to dry.

The only way that the sufficiency of the development could be determined was by the operator looking at the film while in process. When he thought it was about right, he took it out of the bath and sent it to the hypo.

The sections of film thus completed were spliced to make up a single reel of 1,000 feet. In such films there was a different density and quality of finished picture in each of the several sections of the reel, and also scratching due to handling.

This last objection can well be appreciated when you consider that, in showing, the small pictures on the film are magnified several hundred diameters, and therefore scratches hardly observable by the unaided eye become very obvious when viewed upon the screen.

Gaumont attempted to devise means whereby the film could be developed in long strips, by a continuous process, where there would be no interruption of the film during its treatment in successive baths, and an avoidance of manhandling and scratching of the film, by keeping the emulsion side of the film out of contact with any supports. He was not the first, however, to devise means for such purposes.

The result of his endeavors is found in the patents in suit.

In claim 1 of the first patent in suit is defined the process described in that patent, which consists in moving such films or prints endwise over suitable supporting means, and during such movement, and at different points in the travel of the film, subjecting it to the successive action of developing and fixing means, and at all times keeping the emulsion out of contact with the supporting means, and assuring constancy of result by regulating the temperature of the developing solution.

As an approved embodiment of his invention of apparatus described in said patent in suit for carrying out such process Gaumont discloses a series of relatively deep tanks or receptacles for containing developing solution, rinse water, hypo, or fixing solution and washing water. There being in each tank a bank of upper and lower film guiding and supporting spools on shafts which are parallel one to another, and the film being passed endwise through the tanks by being moved up and down over these upper and lower spools, in a vertical spiral motion across the tank, and then carried over in the next tank which it traverses in a similar means in the reverse direction, and so on through the wet end of the apparatus.

Film spools equipped with teeth are referred to as sprockets, which engage the perforations in the margin of the film, impart movement to the film, the sprockets being keyed to separate shafts mounted for rotation in a frame structure; there being as many frames as there are fluid compartments at the baths or receptacles, which shafts are power rotated from a common prime mover such as an electric motor; the frame assembly in each receptacle being adapted to

be individually inserted into, or raised out of, its receptacle, independently and irrespective of the action of the solutions of the remaining receptacles.

Regulation of the temperature of the developing solution is accomplished without changing the strength of the solution by maintaining a constant temperature in a storage reservoir for developing fluid by the circulation of hot or cold water through a coil located within the reservoir.

A centrifugal pump circulates the developing solution from the reservoir to the tanks of the developing fluid, from which it is returned for recirculation.

The film in process may be so threaded, due to the parallel arrangement of the film spools in the upper and lower parts, respectively, of the fluid tanks, that the emulsion face will always be out of contact with the spools, and this is likewise true of the film that engages the film sprockets. When the film makes a single turn in any one tube, the film is crossed or skewed so that the emulsion side remains outermost, even where the film passes under the individual spool or weighted roller near the bottom of the tube.

The operation performed in the tinting and toning tubes and drier is not included in the claimed process.

In the approved embodiment of the apparatus of that patent, the washing tank is succeeded by a series of tubes containing tinting or toning solutions, with means for maintaining a single loop of film in each tube.

These tubes are succeeded by an arrangement for maintaining a loop of film in the open, which consists of two upper spools in fixed axial position, and a lower weighted spool adapted to roll freely at the lower end of the film.

This in turn is succeeded by a drier, consisting of a cabinet divided into two compartments by a partition, which compartments communicate near the top of the cabinet, and openings for the ingress of air on one side of the partition, and the egress of air on the opposite side, whereby the continuous circulation of previously treated air can be maintained.

In the drier, although the arrangement of the parallel upper and lower shafts carrying film spools is similar to that in the developing tank, the driving sprocket, instead of being mounted on a separate shaft, is keyed to the upper shaft on which the free spools are mounted; and the lower shaft, instead of being fixed in the lower end of the frame member, is permitted a limited vertical movement, so that as the film enters the drier and contracts, compensation occurs by readjustment of the lower shafts.

If due to an exigency such as breakage any one of these lower shafts drops too low in the developer, an electrical contact is made by members carried on the lower film spool shafts, which rings an alarm to warn the operator in attendance, and the motor circuit is opened automatically by means of an electrical relay, so that operation of the machine is discontinued.

By the second patent in suit, like means are required in the drier for automatically interrupting the action of the driving means, and, as but one motor is described, any breakage of film in the developer or drier will cause the operation of the machine to be discontinued.

The first Gaumont patent in suit covers the wet end, so called, of the machine, and the second the so-called dry end.

As to patent No. 1,177,697, the suit is based on claims 1, 2, 3, 4, 5, 6, and 15.

Claim 1 reads as follows: "1. The herein described improved process of treating photographic films or prints, which consists in moving such films or prints endwise over suitable supporting means, and during such movement, and at different points in the travel of such films or prints, subjecting the films or prints successively to the action of developing and fixing means, and maintaining the emulsion surfaces of the films or prints at all times out of contact with the supporting means, and assuring a desired action of the developing means by regulation of the temperature thereof."

This claim is for a process.

Of the tank and tube section of the apparatus claim 2 is typical, and reads as follows: "2. An apparatus of the character described having a plurality of fluid receptacles, and means operable to pass photographic films successively through said receptacles, and means including rolls at the upper and lower parts of each receptacle, certain of said rolls being driven feed rolls, said rolls being arranged to support said films in a series of loops in each tank, with the emulsion surface outermost."

Claim 3 implies certain features of the entire apparatus, including the drier, and reads as follows: "3. An apparatus of the character described having a plurality of devices through which photographic films or

prints to be treated are adapted to be passed, means for feeding the films or prints successively through said devices, and mechanism, controlled from the rupture of such films or prints and controlling the operation of said feeding means."

In claim 4, the temperature control device is brought into the general apparatus, and the claim reads as follows: "4. An apparatus of the character described having a developing device, a reservoir adapted to contain a supply of developing fluid, means for heating the fluid within the reservoir, means for passing photographic films or prints through the developing device and means for maintaining continuous flow of the developing fluid from the reservoir to the developing device."

The only reference in the claims is to means for heating the developer, and such means is the coil; it is therefore only a matter of choice in operation whether hot or cold water be run through the coil and the temperature be raised or lowered. That such was the intention of the patentee appears from the specification of said patent in suit.

Claim 5 adds to claim 3: "A signal device, and mechanism controlled from the rupture of such films or prints controlling the operation of said feeding means and controlling the signal device."

Claim 6 adds: "Mechanism controlled from the rupture of such films or prints controlling the operation of said feeding means."

The mechanism is an electrical relay which, when the lower shaft drops too low due to an exigency such as breakage, automatically opens the motor circuit so that operation of the machine is discontinued.

Claim 15 brings into the apparatus: "A frame for each of said receptacles, said frame comprising fixed axles, spools mounted loosely on said axles, and a shaft carrying sprocket wheels for engaging a film, and means for driving said shaft."

As to patent No. 1,209,696, the suit is based on claims 10, 11, 12, 14, 16, and 17.

It was granted on a divisional application, having originally been included in the application on which patent No. 1,177,697 was granted, and having been divided as required by the Patent Office.

Claim 10, which introduces automatically interrupting the action of the driving means in the drier, reads as follows: "10. A drying device for photographic films or prints, comprising means for passing the film or print through the drier, driving means, and means operated by the breaking of the film for automatically interrupting the action of said driving means."

Claim 12, which reads as follows: "12. A drying device for photographic films or prints, comprising means for passing the film or print through the drier in the form of a plurality of loops, said means comprising upper and lower shafts, said lower shaft being supported by the loops in the film." This is a representative claim.

Claim 14 reads as follows: "14. A drying device for photographic films or prints, comprising a chamber having a partition therein, and means for passing the film through the drying device on both sides of said partition, said chamber having openings for the discharge of a current of drying air on each side of said partition."

Claim 16, which reads as follows, is typical of the elevator loop in the open between the tanks and the driers: "16. A drying device for photographic films for prints, comprising means in the drier for carrying forward the film or print, and means for supporting said film in a loop between said means and the point where the film is initially fed to the drying device."

The defendant offered in evidence the following patents and publications:

Patent No. 175,644, to A. T. Becker, for improvement in machines for drying yarns, granted April 4, 1876. This patent is in the textile art.

Patent No. 392,953, to George H. Herrington, for a method of recording speech, granted November 13, 1888.

Patent No. 444,860, to Bradford Stetson, for machine for drying yarns, fabrics, etc., granted January 20, 1891, another patent in the textile art.

Patent No. 525,849, to Elmer F. Mackusick, assignor to Falk Automatic Photo Company, for apparatus for developing, etc., photographs, granted September 11, 1894.

Patent No. 558,301, to Lewis W. Noyes, for machine for drying paper, granted April 14, 1896. Another patent in the textile art.

Patent No. 578,185, to Thomas Armat, for vitascope, granted March 2, 1897.

Patent No. 586,898, to Alfred F. Harris, Charles G. Harris, and William H. Smiley, said Alfred F. Harris and William H. Smiley, assignors to Charles G. Harris, for printing machine, granted July 20, 1897. A patent in the printing machine art.

Patent No. 605,478, to George Gibbs and Irving Stone, assignors to the Gibbs Electric Company, for automatic stop mechanism for printing presses, granted June 14, 1898, is also in the printing machine art.

Patent No. 607,649, to Arthur Schwarz, for apparatus for treating and washing photographic paper, granted July 19, 1898. It teaches continuously processing long photographic bands of paper by the use of a complete processing machine, including both the wet and the dry ends, and particularly variable bath action, space economy in general, control of the baths, the use of a drier employing heated air, the use of line shafts with beveled gearing for driving a series of traversing rollers in unison, alternately driven rollers and idle rollers, and a final wash bath before the passage of the film into the drier, having a regulated, continuous circulation of water in the wash bath.

Patent No. 630,500, to John K. Graeme, for photographic developing apparatus, granted August 8, 1899.

Patent No. 676,314, to Charles Edward Hearson, for apparatus for coating photographic films with sensitive emulsions, granted June 11, 1901, teaches the traversing of cinematograph film endwise through a drying chamber over a succession of transverse frames, each of which carries single long parallel rollers at the top and bottom of the frames, around which the film is carried in a spirally wrapped path, which progresses laterally across the frames, which are arranged transverse to the whole equipment, and on which the film is maintained at all times, with the sensitive face of the film outermost.

The power is furnished by an electric motor, and the patent teaches the use of two chain sprockets on one shaft adjacent to each other, a film moistener in the drying chamber, joined films, and leaders and trailers identical with the practice of today.

The patent also describes the use of a yieldable friction take-up, and teaches the use of a drying chamber through which warmed and dried air is caused to pass.

Patent No. 703,044, to Charles H. Crowell, for drier for paper, cloth, etc., granted June 24, 1902, is a patent in the textile art.

Patent No. 720,708, to Paul Latta, for apparatus for developing, fixing, and toning kinematographic or other photographic films, granted February 17, 1903.

Patent No. 754,748, to John Cocker and Charles Denn, for electric stop motor for warping machine, granted March 15, 1904, is a patent in the textile art.

Patent No. 757,323, to Otto Lienkampf and Willy Nauck, for photographic developing apparatus, granted April 12, 1904, teaches the continuous processing of long bands of photographs, the use of intermediate wash, variable speed, the use of power driven pumps to maintain a recirculation of wash water, but would be equally operable with any of the solutions.

Patent No. 830,741, to Frank S. R. Prentiss, for multiple printing, developing, fixing, washing, and drying apparatus, granted September 11, 1906.

Patent No. 929,678, to Joseph E. Lockwood, for apparatus for exhibiting moving pictures, granted August 3, 1909, teaches the use of a film operated electric safety circuit.

Patent No. 939,350, to Frederick B. Thompson, assignor by direct and mesne assignments to National Waterproof Film Company, for film drying machine, granted November 9, 1909.

British patent No. 22,614, of 1899, to Anton Pollak, Joseph Virag, and Dr. Friedrich Silberstein, for improved automatic developing apparatus for photographic exposures, accepted May 24, 1900.

British patent No. 994, of 1900, to Charles Edward Hearson, for improvements in apparatus for use in and in connection with the coating of photographic films and plates with sensitive emulsion, accepted November 3, 1900, a copy of the American patent No. 676,314, and needs no further description.

British patent No. 24,666, of 1903, to John Dania Tomlinson, for improvements in apparatus for treating textile piece goods with air or other gases or vapours, for drying, bleaching, carbonizing, or other processes, accepted November 10, 1904, a patent in the textile art.

British patent No. 29,620, of 1904, to Adolf Lubbertsmeier and Gustav Klug, for improved apparatus for varnishing sheet metal bands, accepted May 11, 1905.

British patent No. 17,836, of 1905, to Tomlinson Hass, Limited, for improvements in apparatus for drying and carbonizing textile piece goods, accepted May 10, 1906.

British patent No. 22,456, of 1907, to Alfred Watkins, for an apparatus for determining the relative times of development of photographic plates or films for different temperatures, accepted July 23, 1908; a patent in the photographic art, which teaches

that the relation between the temperature of the developer and the speed of development of photographic films was well known in 1907, and that the speed of development, or the time of development for a given temperature, can be calculated from a stated formula.

British patent No. 7,253, of 1908, to John Haslam, for improvements in automatic devices for controlling the speed of and stopping rollers between which fabrics, yarns, paper, and the like are passing, accepted April 1, 1909, a patent in the textile art.

French patent No. 383,074, to M. Henri Joly, for process and device for coloring of cinematographic films, published February 24, 1908.

The foregoing patents in the sheet metal, textile, and printing press arts do not seem to me to be patents in analogous arts, but many of the patents heretofore cited are clearly pertinent citations.

In any event, while in each of these patents are found teachings as to one or more, and in some many, of the elements of the patents in suit, no one of them discloses all of the elements of the process or devices of the patents in suit.

The following of the patents offered in evidence by the defendants were selected by its expert as most nearly in their disclosures approximating that of the patents in suit:

Patent No. 623,837, to Arthur Schwarz, for photographic developing apparatus, granted April 25, 1899, teaches the traversing of bands of photographic paper in a linear series of pendent loops each of which supports an idler or floating roller, the shafts of which are guided at their protruding ends, the use of tanks having compartments varied in size, containing a varied number of loops, the use of a plurality of submerged loops in one compartment, and the use of a line shaft driving a series of traversing rollers through the medium of gearing.

Patent No. 703,671, to Arthur Schwarz, for apparatus for toning photographs, granted July 1, 1902, teaches continuously processing as a whole, variable bath action, variable speed, vertically directed guides, an adjusted position of submerged rollers, the use of line shaft gear to a series of traversing rollers, varied compartment tanks with intermediate wash tanks, and the use of a plurality of loops in a compartment.

Patent No. 721,839, to Arthur Schwarz, for apparatus for developing, toning, and fixing photographs, granted March 3, 1903;

a patent in the photographic art of continuously processing long bands of photographs, and teaches variable bath action, variable speed, the use of a reservoir, and a recirculation system.

Patent No. 891,289, to Charles F. Pease, assignor of one-half to Williams, Brown & Earle, for blueprint washing and drying machine, granted June 23, 1908; a patent in the art of continuously processing long photographic bands, which in this instance are blueprints. It teaches the use of a series of transversing rollers which are driven in unison by chain and sprocket drivers, in both the wet and dry ends of the machine, the concept of chain driven shaft held above the level of the baths, the use of duplicate chain sprockets, the use of a wash tank from which the film passes directly to the drying end, the use of pendent loops on the photographic band, which fully support an idler or floating roller, which is freely suspended in this loop and has no protruding shaft.

British patent No. 16,327, of 1886, to John Urie, Sr., and John Urie, Jr., for improvement in and connected with photography and the treatment of photographic prints or pictures, accepted October 14, 1887; a patent in the photographic art of continuously processing long bands of photographs. It teaches the use of submerged die rollers, variable speed, variable bath action, adjusted position of the submerged roller, a top liquid supply to the tanks, a bottom draw-off siphon, a reservoir for the developer, the maintenance through the draw-off mechanism of a constant level in the processing baths, and a final wash after which the paper passing through the machine is wound up wet in a delivery roll. As an alternative treatment, the patent suggests that, instead of the paper being so rolled up in rolls, it might be conducted over a guide roller at the end of the machine and conducted into a drying room adjacent to the developing mechanism over rollers or traversing carrying cords.

British patent No. 19,726, of 1896, to Wilhelm Grunow, for a new or improved apparatus for developing, toning, fixing, washing, and drying photographs, accepted September 7, 1897; a patent in the art of continuously processing photographic pictures and in particular sensitized photographic paper. The patent teaches particularly the use of intermediate wash, top liquid supply, a line shaft driving the series of transversing rollers through the medium of gearing, a supply main, and the use of submerged rollers

which are pivoted in the sides of the tank in a fixed position and not floating in submerged loops or films.

British patent No. 21,679, of 1897, to Gustave Adolphe de Katow, for improvements in method of and apparatus for developing, toning, and fixing photographs, accepted March 19, 1898.

Practically all of the concepts and teachings of this patent are found in the various Schwarz patents.

It is a patent for continuously processing a strip of sensitized and exposed paper, and teaches how to shorten or extend the time of treatment in the baths by controlling the speed of feeding the paper through the baths, or by immersing the loops of paper more or less deep in the baths, and allowing the speed of travel of the paper to remain unchanged. It also teaches adjusting the position of the frame, the use of a reservoir, and recirculation.

British patent No. 13,315, of 1896, to Cecil Hepworth, for improvements in or relating to the printing and development of photographic film, accepted May 20, 1899, is a patent in the art of continuously processing long photographic bands of prints, such as are used for cinematographic pictures, in particular perforated cinematograph films.

The concept of the patentee of continuous processing was to develop a strip or series of pictures mechanically in an apparatus, to insure uniformity of tone and quality in the finished product, shorten the time required for production of a finished film, and render unnecessary the touching of the film by hand.

The patent teaches variable bath action, by the use with a shallow horizontal bath of a bridge piece adjustable along the top thereof for the purpose of varying the length of time during which the film was immersed in that bath, the use of a plural sprocket shaft; that is, a shaft having more than one roller for traversing the film, each of which rollers has a peripheral series of teeth to engage the perforations in the film, and cause it to move in an endwise fashion past the traversing roller, and the distribution of driving force at intervals along the length of the film to distribute the strain on the film, and for other reasons. It also teaches the use of a top liquid supply in some of the baths, principally the washing baths, a drying apparatus comprising a chamber heated if desired, through which the film may be passed, by an arrangement of supporting and driving rollers idling on stub shafts, and

through the wet end of the machine, the maintaining of the sensitive surface of the film at all times out of contact with the supporting and traversing rolls, and also the maintenance of a constant level in the tank, the use of a vented siphon or a draw, and the use of recessed or undercut rollers so that only the edges of the film may come in actual contact with the surfaces upon which the film bears.

Publication entitled Encyclopaedic Dictionary of Photography, by Walter E. Woodbury, F. R. P. S., 1898. It says at the bottom of page 49, speaking of a machine devised by Urie, of Glasgow, for automatically printing upon strips of sensitive bromide or chloride paper: "A very complete arrangement is now in use in America."

On page 50, the arrangement employed for developing exposed paper is shown. On page 174, the drying chamber referred to on page 50 is shown. On page 488, temperature control by the use of a thermostat and circulating coils thereby controlled is shown.

The patents in suit are entitled to the presumption of validity, and the burden rests upon the defendant to rebut that presumption.

No single reference to the prior art, not even British patent No. 13,315, of 1898, to Hepworth, which defendant's expert selected as most nearly in its disclosures approximating that of the patents in suit, showed the same identical combination of elements recited in the claims of the patents in suit, on which this suit is based.

An examination of the prior art shows that all of the elements of the various combinations of the patents in suit were old and well known, with the exception of the individually and independently removable frame structure for each receptacle for supporting the film in the tank, as well as the number and particular location of the rollers and sprocket wheels supported by the frame.

The patents, however, are not primary or pioneer patents, but represent improvements in a crowded art, and the narrowness of the invention, especially of claims 1 and 2 of the first patent in suit, appears from an examination of the file wrapper and contents.

They have made no real impression on the art, and the evidence offered does not convince me that a machine such as disclosed in the patents in suit was ever built, set up, or operated in this country.

Giving to Mr. Blache full credit for honesty in his belief and testimony, his recollection of the machine which he says was op-

erated at Flushing, which was not fully described, and which testimony was not supported by any documentary evidence, is not convincing.

The commercial success claimed by plaintiff resulted from other patents which plaintiff included in the licenses, among which was that of the Spoor-Thompson Machine Company, machines of which are in common use.

It is also worthy of note that Famous Players Lasky Corporation was the owner of the patents in suit from November 22, 1926, to January 3, 1929, when they were acquired by Spoor-Thompson Machine Company, which owned them until April 11, 1930, when they were acquired by the plaintiff, and that neither the Famous Players Lasky Corporation nor the Paramount Company, as it was subsequently known, the Spoor-Thompson Machine Company nor the plaintiff, built or operated a machine such as is disclosed in the patents in suit; but the Paramount Company continued to use the rack, tank, and drum method from 1926 up to about three months before the trial herein, and none of them are now using a Gaumont machine.

It would thus appear that the patents in suit are paper patents. Of course, the owner of the patents was not obliged to build or operate any machines under the disclosures of said patents.

The patents in suit are valid, but must be strictly construed.

In the alleged infringing Warner machine there is an elevator, comprising an upper row of fixed spools which are freely rotated, being supported by a bar extending across the width of the device, on which bar at right angles to its longitudinal axis are a number of studs, on each of which is mounted one freely rotatable roller, and a lower roll of spools which can raise or lower in the loops of film. The film which is going into the developing tank comes off any one of three magazines.

The purpose of the elevator is for the accumulation of sufficient film to make a splice so that after all the film has been taken off one reel, the end of the outgoing film can be held and attached to the end of the next reel. During this operation the loops are being gradually shortened, and the film is fed constantly into the machine without any interruption.

The arrangement for developing control consists of a coil through which the developer passes, which coil is in a tank which contains the warming or cooling fluid. The developing solution is circulated from the coil through the pump up into the developing tanks. Either cold or warm water as desired is led into the tank by hose and manually regulated so that the temperature is never allowed to go a degree up or a degree down from a given constant.

The film is fed into a series of tubes, and a developing solution is circulated through those tubes. Above those tubes there is a main frame on which is a series of stub shafts carrying smooth spools, and on the opposite edge above the tube is a drum sprocket keyed to a shaft which in turn carries a gear meshing, with a gear on the main drive shaft device which lies longitudinally of the whole machine and is driven by an electric motor.

There are two electric motors; one driving the tank or tube section, the other driving the same arrangement of sprockets in the drying portion of the machine. The film is threaded in a single loop in each one of these tubes, and sometimes given a half twist on its way down to the lower spool, and a half twist on its way up, to reverse the position of the film coming up again. The film comes in over a smooth spool, and it goes out over a sprocket. After the film has gone through the developing baths, it passes to the rinse tanks in which there is water, and passes on in the same manner through identical receptacles into tanks containing a hypo solution for fixing, then the film is subjected to the action of an air jet. Between the hypo tank and the next rinsing tank, the film is looped to tie it down, and at the bottom of the loop is a fixed spool. The film then passes into a rinsing tank where the surplus hypo is rinsed off, and is passed into a tank where it is hardened with an alum solution, but this can be and is sometimes combined with the hypo. The film then travels through the final washing tank. Between the final washing tank of the developer and the drier there is a take-up device which has upper freely rotating fixed spools and lower spools which are mounted on a bar or shaft, the whole of which may raise or lower the loops of the film. The film then passes from the elevator on over to the drier. The drier consists of cabinets with a partition between each of the divisions making up the cabinet. The film is dried by hot air currents, the air having previously been prepared as to humidity and temperature, coming in at the bottom and going out at the top; there being inlets at the bottom and top of each compartment.

There is a motor for driving the drier with the same driving arrangement in the drier that there was in the tank end of the machine, and a sprocket in every compartment at the outgoing side. The lower spools in the drier are mounted on a single shaft and free to rotate but not driven, and free to move up and down in the loops of the film. If the bar or shaft carrying the lower spools gets too low, it makes contact and completes the circuit and rings a bell, and the same thing happens if it goes too high. If the bar or shaft goes too low, it contacts with a bar which shuts off the pneumatic air supply, which closes the switch and stops the motor. There is no arrangement for automatically stopping the motor if the bar goes too high.

This apparatus was in use in defendant's laboratory at the time the suit was filed, and had been for a long time prior thereto, and is still in use. Prior to the commencement of this suit, another form of apparatus was also used, in which there were larger tanks in place of the small tanks, and it differed from the one now in use in that it had, instead of a single tank with a free floating spool, a larger tank with the free floating spools mounted on shafts, which in turn were carried on cross-bars making up a frame. In both types of machine the film was threaded in the straight line method. The temperature control feature was the same in both methods, and that modified form of apparatus is still employed.

A cylindrical reservoir. having a capacity of 300 liters, for developing solution is used, and the developing solution is fed from the reservoir through a pipe line to the circulating system; the amount supplied being controlled by a valve. There is no temperature control in the reservoir. The capacity of the reservoir compared with the volume in the coil is 30 to 1.

The machine was originally built by the Kalem Company; the witness Spray, who was the manager of their laboratory, had charge of its construction; it was planned in 1915 and completed in the early part of 1918, since which time it has been continuously operated. In January, 1919, it was acquired by the Vitagraph Company of America, and in 1925 it was acquired by the defendants when they acquired the Vitagraph Company. During all of the time since it was originally built, the machine has been under the witness Spray's direct personal supervision.

The Consolidated Film Industries owns one hundred per cent. of the stock of the plaintiff, and on request the witness Spray gave to the attorney for said Consolidated Film Industries, on February 26, 1926, an affidavit describing the defendant's machine, with other papers, one of which was a printed description of the machine published in the magazine Moving Picture World of August 3, 1918, which affidavit and exhibits were produced by counsel for plaintiffs pursuant to a notice to produce, and were offered in evidence by counsel for the defendant.

As I have hereinbefore said, Gaumont was not a pioneer but an improver, and, while entitled to a range of equivalents, he is not entitled to a broad range, but only sufficient to protect his actual invention.

Both the machines of the patents in suit and of the defendant are machines for continuously processing films; but an examination of the prior art shows that machines for that purpose were known before the patents in suit.

While it is true that the patents in suit and defendant's machine accomplish the same result, that is not sufficient to establish infringement, and that is likewise true, even though the patents might read literally on the defendant's machine, as the principle of the defendant's device is so different that the claims of the patent literally construed, if read upon it, would not represent the actual invention of the patent in suit. Westinghouse v. Boyden, 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136.

With reference to the first patent in suit, No. 1,177,697.

Claim 1 is for the process, and the invention shown and described in the specifications rests (1) in the endwise movement of the film; this is not found in the defendant's machine as in that machine the film travels lengthwise; (2) in maintaining the emulsion side of the film at all times out of contact with the means employed for supporting the film in its travel through the machine. This it seems to me is the function of the spiral endwise travel of the Gaumont machine, and this function is alone made possible by the structure comprising the fixed frames, one for each tank, with fixed upper and lower shafts, each carrying a plurality of crowned rollers.

The instrumentalities provided for insuring a spiral path of travel of the film will insure the emulsion side of the film remaining outermost if it is outermost when fed to the machine.

The structure of the defendant's machine is incapable of accomplishing the travel therethrough of the film endwise or the emulsion side out of contact with the supporting means.

If the last result is desired, it can be accomplished not by reason of the structure of the machine, but by the human expedient of twisting the film within the tanks.

It is of no moment in the defendant's machine whether or not the film is emulsion side out, because all sprockets and rollers are undercut or recessed so as to avoid scratching or otherwise injuring the film intermediate the feed sprocket holes which contain the photographic image. Defendant does not infringe this claim.

Claim 2 recites as a part of its combination "means operable to pass photographic films successively through said receptacles," and defines the means as "including rolls at the upper and lower parts of each receptacle, certain of said rolls being driven feed rolls."

The structure thus described requires more than one roll, which are driven for each receptacle, and this is shown in Fig. 4.

It was not new with Gaumont to pass photographic films successively through receptacles, and to sustain this claim it must be construed to cover the structure of the patent in suit. If it be broadened to cover defendant's machine, which employs a floating roller arrangement as distinguished from the fixed axle upper and lower structure of the patent in suit, it would be invalid.

In the defendant's structure but one power driven roll is necessary or is provided for each tank or receptacle.

In this claim, there is likewise a requirement to support the films "with the emulsion surface outermost"; but it is unnecessary to repeat what I have already said on this subject as to claim 1, except to say that, if such result can be accomplished in the defendant's machine, it is not by reason of the structure of the machine, but by the human expedient of twisting the film within the tanks; and further, that it is of no moment in the defendant's machine, because all sprockets and rollers are undercut or recessed.

Claim 3 includes as elements (1) means for feeding films or prints successively through the machine; and (2) mechanism controlled from the rupture of the films for controlling the operation of the feeding means.

As I said with reference to claim 2, it was not new with Gaumont to pass photographic films successively through receptacles. This is clearly shown by the prior art. There are very substantial differences between the means of the Gaumont machine and the feeding devices of defendant's machine, and, when the very small contribution made to the art by Gaumont is considered, the doctrine of equivalents cannot include the defendant's machine, because if that was possible this claim would be invalid.

The alarm device of this claim is for the wet end of the Gaumont machine, and, as he employed but a single motor to operate both the wet and dry ends of his machine, it was Gaumont's purpose in the event of a rupture of the film to automatically stop the wet end of the machine.

This was entirely contrary to the automatic stop and alarm device of defendant's machine, which employs separate motors for driving the wet and dry ends of the machine, and as the defendant's machine employs the automatic stop mechanism in the drier only, and not in the wet end, the rupture of the film would stop the dry end only, and not the wet end.

As the ruptures of film occur most frequently in the drier, in the defendant's machine, developing, washing, and fixing can continue while the rupture in the drier is being spliced, whereas in the Gaumont machine a rupture of the film stops the wet end. This claim is not infringed.

Claim 4. The means for passing photographic films through the developing device, as hereinbefore pointed out, differ radically in Gaumont and the defendant's device, and Gaumont in view of the prior art is strictly limited to those means.

There is also included in this claim a specific element, "means for heating the fluid within the reservoir." This means heating coil 8, located within the developer reservoir 7. Certainly Gaumont's invention did not consist in discovering the necessity of having the developer at a proper temperature.

That was known almost if not at the beginning of the photographic art, and such teaching is found in the prior art. Whatever invention Gaumont made as to controlling temperature was in locating the temperature controlling medium within the reservoir, and he so limited this claim. In defendant's machine there is no provision for temperature regulation within the reservoir, nor any means for controlling the temperature of the fluid within the reservoir. In the defend-

ant's machine, the temperature control is located between the reservoir and the receptacles or tanks through which the film is passed. This claim is not infringed.

As to claims 5 and 6, what I have said as to claim 3 applies, as they are directed to substantially the same subject-matter. There is no signaling apparatus employed in the wet end of the defendant's machine. These claims are not infringed.

Claim 15 includes as elements, a frame for each receptacle; said frame comprising fixed axles, spools mounted loosely on said axles, and a shaft carrying sprocket wheels for engaging a film.

The frame referred to is shown in Fig. 4 of the first patent in suit.

There is described in the specification and required in the claim a frame for each receptacle. The fixed axles of each frame are upper shaft 43 and lower shaft 42, which are fixed relative to each other by the rigid side members of the frame. The spools or rollers are coaxial on the common axles. The shaft 38 carried by the frame carries the sprocket wheels.

The defendant's machine does not employ a frame for each receptacle, but is in such machine a single iron beam extending the entire length of the machine, which beam supports the various upper rollers in all of the receptacles. Fixed upper and fixed lower axles are not employed in defendant's machine. The lower rollers in each receptacle are freely floating rollers, the axles of which are not fixed and do not form part of a rigid frame. The rollers are not supported on common axles and are not coaxial. In the defendant's device but one sprocket wheel is employed in each receptacle of the defendant's machine. This claim is not infringed.

With reference to the second patent in suit, No. 1,209,696, claims 10 and 11 in addition to other elements require, "means operated by the breaking of the film for automatically interrupting the action of said driving means." What I said with reference to claims 3, 5, and 6 of the first patent in suit is applicable here, and need not be repeated. There being but one motor in Gaumont's machine, a rupture of the film stops the entire machine and not the drier alone. This is what the patent teaches, and by that teaching it escapes double patenting. Therefore there can be no infringing by the defendant's machine, in which only the drier is stopped and not the developer. These claims are not infringed.

Claim 12. If the element of this claim, "means for passing the film or print through the drier in the form of a plurality of loops, said means comprising upper and lower shafts, said lower shaft being supported by loops in the film," is to be construed so broadly as to cover the defendant's machine, then this claim would be invalid, as Gaumont made no such broad invention, as will appear from an examination of the prior art.

The structures of the two machines are radically different, as is also their operation.

The invention of Gaumont to which his claim must be restricted was the construction comprising a common upper shaft, on which were coaxially mounted a number of rollers, and a common lower shaft, on which were coaxially mounted a number of rollers, so as to afford an endwise spiral path of travel for the film.

This was not the construction employed by the defendant, which comprises a single stub shaft for each roller, parallel to each other not coaxial; the film traveling not spirally but in a straight through line, as was common practice in the prior art. This claim is not infringed.

Claim 14. Gaumont cannot claim broadly for any means for passing the film through the drying device and the supply of conditioned air to the drying chamber, because if he did the claim would be invalid. Therefore, in construing this claim, the means for feeding the film must be construed in accordance with the disclosure of means in the specification, and, as so construed, the differences between Gaumont's film feeding means and those of the defendant's machine are so great that this claim is not infringed.

Claims 16 and 17 cover apparatus which feeds the film or print through the drier, and "means for supporting said film in a loop between said means and the point where the film is initially fed to the drying device"; the means last referred to being the feeding means. Figs. 3 and 4 of the patent show this arrangement. Sprocket wheel 65a is the "means" for feeding the film through the drier. Rollers 55 and 57 are the "means" for supporting the film in a loop between the sprocket wheel and the point where the film is initially fed to the drier. The roller 55 constitutes the point where the film is initially fed to the drying device, and the loop 1 is found between roller 55 and the feed sprocket 65a. No such structure is employed in the defendant's machine. Gaumont provided this skewed loop arrangement

for the purpose of compensating for variation in the speed of film travel incident to the use of endless chain driving connections. Compensation for variation of speed in defendant's machine is automatically taken care of by the freely floating rollers in the wet end of the machine, as well as in the drier. Gaumont's skewed loop, as defined in this claim, does not read on the elevator or accumulator in the defendant's machine, which is provided for a function and purpose not contemplated by Gaumont and incapable of being accomplished by the skewed loop of this claim.

There is neither identity of structure, function, purpose, or operation between the two. These claims are not infringed.

The second patent in suit is not invalid because of alleged commercial use in the United States more than two years prior to its filing date.

The divisional application covers the drier which was fully shown and described in the original or parent application as filed. The essence of claims 16 and 17 was claimed in original claim 18 of the parent application, and the substance of said claims was covered by original claim 20 of the second patent in suit.

As to claims 10, 11, 12, and 14 of the second patent in suit, the subject-matter thereof appeared in some form or in some way indicating an intent to protect that subject-matter, and that was sufficient. Westinghouse v. Jeffrey-De Witt Insulator Co. (C. C. A.) 22 F.(2d) 277. This is apparent from a consideration of the file wrapper and contents. (See original claims 13, 16, 17, 22.) Claims to the drier per se were inserted in the parent application on August 16, 1912, less than two years after the alleged date of public use in 1910.

In any event, the evidence of the witness Blache, however honest and truthful he may be, was not sufficiently definite, nor was it corroborated by any documentary proof which made the proof clear, satisfactory, or beyond a reasonable doubt.

As to the defense of laches, it is true that there is no positive evidence that personal notice was given to any individual, firm, or corporation whose name is found among those in the chain of title, but the evidence does show that defendant and its predecessor have been using the alleged infringing machine since 1918; that a description thereof was published in the Moving Picture World of August 3, 1918; that this use was known to those interested in the motion picture industry, as shown by the knowledge imparted to officers of the Craftsman Company, afterward merged in the Consolidated Film Industries, Inc., and the affidavit and exhibits requested in September, 1925, and furnished in February, 1926, by Mr. Spray, the manager of defendant's laboratory to the attorneys for the Consolidated Film Industries, Inc., which became the owner of one hundred per cent. of the stock of the plaintiff herein.

The defendant is well known in the industry, and it purchased the machine from the Vitagraph Company in April, 1925, when they acquired the plant of that company at East Fifteenth street and Avenue M, in this borough, where said machine was in operation and had been operated by the Vitagraph Company, also well known in the industry since they had acquired it in 1919.

No suit was instituted until August 12, 1930, although the first patent had been granted on April 4, 1916, and the second patent on December 26, 1916, and defendant was not conscious of an infringement even if it be found that I am in error, and that it did infringe.

Almost seven years elapsed after the publication in Moving Picture World before the defendant acquired the machine, and over five years elapsed after defendant purchased the machine, and over four years elapsed after the manager of their laboratory gave the affidavit and exhibits to the attorneys for Consolidated Film Industries, Inc., which became the owner of one hundred per cent. of the stock of the plaintiff herein, before this action was started.

Before the plaintiff had organized and acquired the patents in suit, Consolidated Film Industries, Inc., the owner of one hundred per cent. of its capital stock, had full information as to the machine of the defendant, now alleged to infringe, and that it was being and had been operated for a long time.

This is not a defense of estoppel, but of laches, and it would be inequitable to now hold the defendant, but a short time before the patents expire, who bought this machine almost seven years after it was put into open, public, not secret, use during which time no suit for infringement had been commenced, and openly used the machine for over five years after such purchase before any suit was commenced.

While it may be that knowledge has not been established sufficient to warrant the application of the doctrine of estoppel, it seems clear to me that, on the evidence before this

court, the doctrine of laches applies. ·Triplex Safety Glass Co. v. Kolb, 53 F.(2d) 1062, opinion of Kirkpatrick, J., D. C., E. D. Pa., June term, 1931.

Certainly the owners of these patents have slept on their rights, and I believe there has been acquiescence in the alleged infringement. If the owners of the patents had proceeded diligently to protect their rights, it is hard to believe defendant would have purchased the machine, and the court should not entertain this complaint. Kittle v. Hall (C. C.) 29 F. 508, 511.

The delay has clearly been prejudicial to the defendant. Window Glass Mach. Company v. Pittsburgh Plate Glass Company (C. C. A.) 284 F. 645. .

The excuse of pending litigation offered on behalf of the plaintiff does not seem to have merit, as it clearly appears that there. was no litigation instituted against any one until over eleven years after the granting of the first patent, and nearly eleven years after the granting of the second patent, and over two years after defendant purchased the machine, and that the only actions commenced were filed in the Southern district of California; that by Paramount Famous Lasky Corporation v. Chester Bennett Film Laboratories, on July 12, 1927, the complaint in which was dismissed by consent on June 17, 1929, and that by Spoor-Thompson Machine Company v. Consolidated Film Industries, Inc., filed December 24, 1929, and dismissed by consent on April 16, 1930, and that another was commenced and is now pending.

This defendant and its predecessors have been openly and publicly manufacturing processing machines of which plaintiff complains from 1918 for about twelve years, and over fourteen years had elapsed after the granting of the first patent, and nearly fourteen years had elapsed after the granting of the second patent, before this action was commenced. Laches of this character is such as will prevent a court of equity from entertaining the bill. Woodmanse & Hewitt Mfg. Co. v. Williams (C. C. A.) 68 F. 489.

The defense of laches has been established.

The defendant may have a decree against the plaintiff dismissing the complaint, with costs.

Submit proposed findings of fact and conclusions of law, for the assistance of the court, pursuant to the equity rules and the rules of this court. Settle decree on notice.