## CINEMA PATENTS CO., Inc., v. DUPLEX MOTION PICTURE INDUSTRIES, Inc.

### No. 5132.

District Court, E. D. New York.

Feb. 2, 1932.

1014

Kiddle, Margeson & Hornidge, of New York City (Henry T. Hornidge, of New York City, Melville Church, of Washington, D. C., and Herbert A. Huebner, of New York City, of counsel), for plaintiff.

Lewis J. Doolittle and Samuel E. Darby, Jr., both of New York City, for defendant.

CAMPBELL, District Judge.

This is an action in equity for damages and relief by injunction for the alleged infringement of patent No. 1,177,697, issued to Leon Gaumont, for developing, fixing, toning, and otherwise treating photographic films and prints, granted April 4, 1916, and patent No. 1,209,696, issued to Leon Gaumont, assignor to Société Etablissements Gaumont, for apparatus for drying photographic films, granted December 26, 1916.

The jurisdictional facts and title of the plaintiff to the patents in suit and notice of infringement directed by the plaintiff to the defendant prior to the filing of suit are admitted.

The defendant, a manufacturer of the alleged infringing machines, by answer interposed the defenses of invalidity, noninfringement, and laches, and during the pendency of this suit, a receiver of the defendant having been appointed, leave was granted by the court, upon stipulation of the parties, to join the receiver as a party defendant, which was done, and the receiver filed his answer to the supplemental bill, and was represented by counsel, who carried on the defense of this suit.

The patents in suit relate to the motion picture art, and disclose a continuous process for developing motion picture films and apparatus for carrying out that process.

The patents in suit have never been adjudicated.

The instant suit is a companion suit to Cinema Patents Co. v. Warner Brothers Pictures, Inc., 55 F.(2d) 948, this day decided by me. The record in that suit is stipulated herein, and as I, in my opinion in that suit rendered this day, fully discussed the patents in suit and analyzed the prior art, it is unnecessary to again discuss those matters, but I refer to that opinion and incorporate the discussion of the patents in suit and the analysis of the prior art in and make it part of this opinion.

As I said in that opinion, and here repeat, Gaumont attempted to devise means whereby the film could be developed in long strips, by a continuous process, where there would be no interruption of film during its treatment in successive baths, and an avoidance of manhandling and scratching of the film, by keeping the emulsion side of the film out of contact with any supports, but he was not the first, however, to devise means for such purposes.

The result of his endeavors is found in the patents in suit.

Claim 1 of the first patent in suit defined the process described in that patent, but we have no concern with that claim in the instant suit, as the defendant's alleged infringement consisted solely in the manufacture and sale of the machine and not in the practice of the process or use of the machine.

As an improved embodiment of his invention of apparatus described in said patents in suit for carrying out such process, Gaumont discloses a series of relatively deep tanks or receptacles for containing developing solution, rinse water, hypo, or fixing solution and washing water, there being in each tank a bank of upper and lower film, guiding and supporting spools on shafts which are parallel one to another, and the films being passed endwise through the tanks by being moved up and down on these upper and lower spools, in a vertical spiral motion across the tank, and then carried over in the next tank, which it traverses in a similar means in reverse direction, and so on through the wet end of the apparatus.

Film spools equipped with teeth, and referred to as sprockets, which engage the perforations in the margin of the film, impart movement to the film, the sprockets being keyed to separate shafts mounted for rota-

tion in a frame structure, there being as many frames as there are fluid compartments at the bath or receptacles, which shafts are power-rotated from a common prime mover such as an electric motor, the frame assembly in each receptacle being adapted to be individually inserted into or raised out of its receptacle, independently and irrespective of the action of the solutions of the remaining receptacles.

Regulation of the temperature of the developing solution is accomplished without changing the strength of the solution by maintaining a constant temperature in a storage reservoir for developing fluid by the circulation of hot or cold water through a coil located within the reservoir. A centrifugal pump circulates the developing solution from the reservoir to the tanks of the developing fluid, from which it is returned for recirculation.

The film in process may be so threaded, due to the parallel arrangement of the film spools in the upper and lower parts, respectively, of the fluid tanks, that the emulsion face will always be out of contact with the spools, and this is likewise true of the film that engages the film sprockets.

When the film makes a single turn in any one tube, the film is crossed or skewed so that the emulsion side remains outermost, even where the film passes under the individual spool or weighted roller near the bottom of the tube.

In the improved embodiment of the apparatus of that patent, the washing tank is succeeded by a series of tubes containing tinting or toning solutions, with means for maintaining a single loop in each tube.

These tubes are succeeded by an arrangement for maintaining a loop of film in the open, which consists of two upper spools in fixed axial position, and a lower weighted spool adapted to roll freely at the lower end of the film.

This in turn is succeeded by a drier, consisting of a cabinet divided into two compartments by a partition, which compartments communicate near the top of the cabinet, and openings for the ingress of air on one side of the partition and the egress of air on the opposite side, whereby the continuous circulation of previously treated air can be maintained.

In the drier the arrangement of the parallel upper and lower shafts carrying film spools is similar to that in the developing tank, the driving sprocket, instead of being mounted on a separate shaft, is keyed to the upper shaft on which the free spools are mounted, and the lower shaft, instead of being fixed in the lower end of the frame member, is permitted a limited vertical movement, so that, as the film enters the drier and contracts, compensation occurs by readjustment of the lower shafts.

If due to an exigency such as breakage any one of these lower shafts drops too low in the developer, an electrical contact is made, by members carried on the lower film spool shafts, which rings an alarm to warn the operator in attendance, and the motor circuit is opened automatically by means of an electrical relay so that operation of the machine is discontinued.

By the second patent in suit, like means are required in the drier for automatically interrupting action of the driving means, and, as but one motor is described, any breakage of film in the developer or drier will cause the operation of the machine to be discontinued.

The first Gaumont patent in suit covers the wet end, so-called, of the machine, and the second the so-called dry end.

As to patent No. 1,177,697, the suit is based on claims 2, 8, 9, 10, 11, and 12.

Claim 2 reads as follows: "2. An apparatus of the character described having a plurality of fluid receptacles, and means operable to pass photographic films successively through said receptacles, said means including rolls at the upper and lower parts of each receptacle, certain of said rolls being driven feed rolls, said rolls being arranged to support said films in a series of loops in each tank, with the emulsion surface outermost."

Claims 8 to 12, both inclusive, may be considered in a group, with claim 8 as representative.

Claim 8 reads as follows: "8. An apparatus for developing photographic films, comprising a series of tanks, and means associated with each of said tanks and adapted to cause the film to move therethrough in a spirally winding path, one element of said means being positively driven and being adapted to positively engage the film."

As to patent No. 1,209,696, the suit is based on claims 12, 14, 16, and 17 in suit.

Claim 12 reads as follows: "12. An apparatus for developing photographic films, comprising a series of tanks, and means associated with each of said tanks for directing said film strip in a spirally winding path, one element of said means being in positive en-

gagement with said film strip and being positively driven to impart movement thereto."

Claim 14 reads as follows: "14. An apparatus for developing photographic films, comprising a series of tanks for containing the baths, a frame for each of said tanks, and means for guiding a film strip spirally around said frame one element of said means being positively driven and adapted to positively engage said film strip to impart movement thereto."

Claims 16 and 17 may be considered together; claim 16 being taken as a representative claim.

Claim 16 reads as follows: "16. An apparatus for chemically treating photographic film, comprising a plurality of tanks, and means for successively passing a photographic film in a series of loops through each tank, said means including a frame associated with each tank and extending thereinto, positively driven feed rolls at the top of each of said frames, said feed rolls adapted to positively engage said film, and idle rolls at the bottom of each of said tanks."

■ The patents in suit are entitled to the presumption of validity, and the burden rests upon the defendant to rebut that presumption.

Referring to the analysis of the prior art set forth at length in my opinion this day filed in the companion suit brought by this plaintiff against Warner Brothers Pictures, Inc., I repeat that no single reference to the prior art, not even British patent No. 13,-315 of 1898, to Hepworth, which defendant's expert selected as most nearly in its disclosures approximating that of the patents in suit, showed the same identical combination of elements recited in the claims of the patents in suit, on which this suit is based.

An examination of the prior art shows that all of the elements of the various combinations of the patents in suit were old and well known, with the exception of the individually and independently removable frame structure for each receptacle, for supporting the film in the tank, as well as the number and particular location of the rollers and sprocket wheels supported by the frame, but it seems to me that there was novelty and invention in the specific structure of the patent in suit, and not a mere aggregation.

The patents, however, are not primary or pioneer patents, but represent improvements in a crowded art, and the narrowness of the invention, especially of claim 2 of the first patent in suit, appears from an examination of the file wrapper and contents.

They have made no real impression on the art, and the evidence offered does not convince me that a machine such as disclosed in the patents in suit was ever built, set up, or operated in this country.

I can find no commercial success of the patents in suit, as they are paper patents, and the licenses made by plaintiff include other patents, among which was that of the Spoor-Thompson Machine Company, the machines of which are in common use.

No owner of the patents in suit, beginning with Famous Players Lasky Corporation, which acquired them on November 22, 1926, ever built or operated a machine such as disclosed in the patents in suit. In fact, the Paramount Company, the successor of Famous Players Lasky Corporation, paid its tribute to the prior art by using the rack, tank, and drum method up to about three months before the trial herein, and was not even at the time of the trial herein using a Gaumont machine.

■■ The patents in suit are valid, but must be strictly construed.

Two forms of machines manufactured and sold by the defendant are alleged to infringe, the first of which will be identified as the "Old Form," which was manufactured and sold from about 1920 until 1925 or 1926, and the second as the "New Form."

The old form is made up of a series of tubes or receptacles which are adapted to contain developing bath, rinsing water, hypo or fixing bath and washing water, arranged to be used in succession in the order named. After passing through the developer portion of the machine and leaving the last washing bath, the film goes over an elevator and passes into a drying cabinet.

The film starts into the apparatus from a reel, it is fed straight through, and goes up and down over a series of upper fixed spools and lower floating spools, in the open air. This is called an accumulator or loading elevator, from which it passes into the first developing receptacle. It continues up and down through the developing receptacles, and continues in the same path through the rinse, hypo, and washing, and then passes to an elevator which consists of a series of upper driven sprockets and a series of lower freely rotating, floating idle spools. The teeth of the upper driven sprockets engage the perforations in the film to drive it. The lower

spools are smooth spools. In the tubes there is an idle roller to keep the film down. Between the washing tube and the elevator there is an air squeegee. The whole device was driven by one motor, but there was a mechanical clutch in the device, so that the dry end could be disengaged from the wet end, and operate the wet end or the dry end independently of the other, and stop the dry end while the wet end was running. The arrangement of the driving members and spools in the drier was the same as in the wet end, that is, all of the upper spools were sprockets power driven, and all the lower spools were idle spools floating in loops. The lower spools in the drier are mounted on bars, and there is one bar for each compartment of the drier; the compartments being separated from each other by partitions. When the film has been finally dried, it is brought out over a sprocket at the outgoing end of the drier and wound up on a take-up reel.

The new form differs somewhat in detail of construction from the older machine. The film is delivered from the magazine and passes over the idle spools prior to engaging with a power-driven sprocket, of which there is one positioned and functioning in connection with each of the tanks throughout the machine. Intermediate these sprockets is a series of idle rollers on a shaft at the upper part of the tank, and a similar series adapted to be normally positioned at the lower part of the tank. As the film leaves the last lower roller, it is given a half twist to bring the film emulsion face out over the spools marked S on Exhibit 37, and the spool S guides the film onto the next sprocket. This structure is repeated in every tank in the machine.

The first element of the machine is a loading cabinet or loading elevator, next the developing tanks, followed by a relatively small rinse tank, succeeded by fixing tanks, which are in turn succeeded by washing tanks, and at the outgoing end of the wash tank is another elevator in the open air. All of the sprockets are driven from the same motor from a common shaft.

In the drier the film is carried through in the same direction, by the same means as occur in the wet end of the machine. The drier is divided into compartments by partitions separating the compartments. The drier is open at the bottom for the admission of air, and closed at the top. The lower rollers are all idle rollers mounted on a shaft, which is parallel to the upper idle roller shaft, and the lower shaft is adapted to move up or

down if the film expands or contracts. There are no means supplied for signalling the operator in the event the film breaks, nor are there any means for automatically stopping the motion of the machine by cutting of an electric switch if the film breaks.

There is but one motor, but there is a mechanical clutch by which the drier may be disconnected and at the same time the wet end allowed to continue operating, but the wet end cannot be stopped and the drier allowed to continue to operate.

No reservoir or temperature controlling coil was supplied with this outfit, nor was the purchaser told where they could get them. No alarm system was put on the defendant's machine.

The machine shown in the drawing in evidence is a double machine, in fact, two independent machines, that is, one complete unit comprising the wet and dry ends on one side, and a second complete unit comprising the wet and dry ends on the other side. One tank is utilized for two developing operations simultaneously. There are two separate motors, one for each side, and you can run one side or the other independently, and the operation or functioning of one machine has no effect whatsoever on the other.

In neither form of defendant's machines are there frames in each receptacle, independently removable in and out, as described in the patent in suit. The sprockets in neither form are mounted on the same shaft but on separate studs mounted on a beam which extended the entire length of the wet end of the machine, and on another shaft through the dry end.

The new form differs from the old form in one respect, namely, that the film travels in a spiral path, whereas in the old form it traveled in a straight path. In both forms there is only one sprocket wheel for each tank, and the axis of that sprocket is at right angles to the axis of the remaining rolls. The driving means for the sprockets themselves is a horizontal shaft with a pair of beveled gears.

Both the defendant's machines and that of the patents in suit are machines for continuously processing films, but Gaumont was not the first to invent machines for that purpose, as is clearly shown in the prior art; in fact, to sustain the validity of the patents in suit their claims must be strictly limited to Gaumont's particular construction, for the reason that such is his invention.

If the Gaumont claims be considered as giving to him a monopoly on all structures accomplishing or capable of accomplishing the intended results, then they would be invalid.

With reference to the first patent in suit, No. 1,177,697, claim 2, which plaintiff contends is infringed by both forms of defendant's machines, recites as a part of the combination, "means operable to pass photographic films successively through said receptacles," and defines the means as "including rolls at the upper and lower parts of each receptacle, certain of said rolls being driven feed rolls."

The structure thus described requires more than one roll, which are driven for each receptacle, and must be limited to the frame structure and assembly disclosed in Fig. 4 of the first patent in suit. Neither form of the defendant's machines employs any such structure or any equivalent thereto.

It is further provided in said claim that the rolls be arranged to support the film in a series of loops in each tank, "with the emulsion surface outermost."

This is not true of the defendant's machines, and the condition is not present in them, as the film does come in contact with a number of supporting rolls and/or feed sprockets, and while from time to time, by the human expedient of twisting the film within the tanks, the emulsion surface may be kept outermost, it is of no moment, because all the sprockets and rollers on defendant's machines are undercut or recessed so as to avoid scratching or otherwise injuring the film.

■ Defendant does not infringe this claim.

Claims 8 to 12, which plaintiff contends are infringed by the new form of defendant's machines, are limited, by language which differs in the several claims, to feeding the film in a spiral path.

This was not new, as is apparent from an examination of the prior art, and, if they are to be sustained as valid, these claims must be limited to the structure that Gaumont invented, with the endwise spiral travel in a series of parallel successive groups, which extend transversely of the lengthwise dimension of the machine, imparted by the specific instrumentalities of the Gaumont patent. The defendant's machines do not employ the specific instrumentalities of the Gaumont machine, and the film does not travel endwise but lengthwise through the machine. These claims are not infringed.

■ With reference to the second patent in suit, No. 1,209,696.

As to claim 12, all that I said with reference to this claim in my opinion in the companion case of Cinema Patents Co., Inc., v. Warner Brothers Pictures, Inc., need not be repeated. It is sufficient to say that the structures of the machines of the patent in suit and the defendant's machine are radically different, as is also their operation, and, if this claim is to be construed so broadly as to cover the defendant's machines, then it would be invalid.

But I must add that the machine of the defendant in this case differs from the defendant's machine in the said companion case, in that in the defendant's machine in this case the film does travel spirally, whereas in the defendant's machine in the companion case it traveled, not spirally, but in a straight line. This claim is not infringed.

As to claims 14, 16, and 17, nothing need be added to what I have said in my opinion in the companion case of Cinema Patents Co., Inc., v. Warner Brothers Pictures, Inc. These claims are not infringed.

■ The second patent in suit is not invalid because of alleged commercial use in the United States more than two years prior to its filing date, for the reasons I assigned in my opinion in the companion case of Cinema Patents Co., Inc., v. Warner Brothers Pictures, Inc., which it is unnecessary to repeat.

■ As to the defense of laches, the proof in this case differs materially from that which was offered in the companion case of Cinema Patents Co., Inc., v. Warner Brothers Pictures, Inc.

In the case at bar there is evidence of the continuous manufacture of the old form from 1920 to 1925 or 1926, and the new form from 1925 on, the publication of a drawing and description of the defendant's machine published in 1925, which was in possession of plaintiff's counsel on the trial. The patents in suit were issued in 1916, and no action was commenced on the East Coast until 1930.

The excuse for delay in prosecuting in the case at bar is the existence of litigation on the West Coast, which was not commenced until over eleven years after the first patent issued, and nearly eleven years after the second patent issued. No action based on infringement was commenced from the granting of the patent in all of that time. The first action by Paramount Famous Lasky Corporation v. Chester Bennett Film Laboratories was filed in the Southern District of

California, on July 12, 1927, and the complaint was dismissed by consent on June 17, 1929, and the second action by Spoor-Thompson Machine Company v. Consolidated Film Industries was filed December 24, 1929, and dismissed by consent on April 16, 1930, and that an action is now pending in California by this plaintiff against a company to whom defendant had sold one of its machines.

During all of the time from 1920 to the date of the filing of the bill of complaint the defendant was openly, not secretly, engaged in manufacturing what is now claimed is an infringement, without any action being taken on the part of the owner of the patent, even the giving of notice, until shortly before the commencement of this action.

Laches of this character is such as will prevent a court of equity from entertaining the bill. Woodmanse & Hewitt Mfg. Co. v. Williams (C. C. A.) 68 F. 489. The defense of laches was sustained.

The defendant may have a decree against the plaintiff dismissing the complaint, with costs.

Submit proposed findings of fact and conclusions of law, for the assistance of the court, pursuant to the equity rules and the rules of this court.

Settle decree on notice.