## CINEMA PATENTS CO., Inc., v. CRAFT FILM LABORATORIES, Inc., et al.
### No. 4943.

Circuit Court of Appeals, Third Circuit.
March 9, 1933.

See, also, 42 F.(2d) 749.

Herbert A. Huebner, of New York City, and Charles C. Keedy, of Wilmington, Del., for appellant.

Charles A. Collin, of New York City, Charles F. Curley, of Wilmington, Del., and George F. O'Neill, of New York City (Collin, Wells & Hughes, of New York City, of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below a decree was entered dismissing a bill filed by the Cinema Patents Company, Inc., charging infringement by the Craft Film Laboratories, Inc., of patents No. 1,177,697, granted April 4, 1916, to Leon Gaumont, and No. 1,209,696, granted December 26, 1916, also to Leon Gaumont, assignor to Société Etablissements Gaumont, of Paris, France. From such decree plaintiff took this appeal.

By reference to Cinema Patents Co. v. Warner Bros. Pictures (D. C.) 55 F.(2d) 948, and Cinema Patents Co. v. Duplex Motion Picture Industries (D. C.) 60 F.(2d) 1013, which involved these same patents, and by further reference to the opinion of the judge below, we avoid a needless repetition of the subject-matter of these patents, which cover the development of photographic negatives for use in moving pictures. Moreover, the opinion of the trial judge so comprehensively covers all phases of the case and so fully vindicates the conclusion reached that an effort by this court to file a lengthy opinion could not be but needless repetition. We therefore confine ourselves, in affirming its decree, to a brief statement of the underlying question of the plaintiff's lack of merit in the way of equitable relief.

Gaumont and Société held the patents until October 22, 1926, when they assigned them to the predecessor in title of the plaintiff company, which latter became the owner April 11, 1930. In such assignment by Gaumont and Société to plaintiff's predecessor, the latter agreed "that it will not sue or in any way interfere with * * * the use or sale of any machines heretofore sold in the United States by said Société or its representatives * * * nor said fourteen (14) machines, or any of them which are to be sold in the United States by said Société." Now, as the machines herein alleged to infringe are therein referred to, we seek in the proofs an account of the acts and dealings of the parties in reference thereto. Gaumont's machines were built up from some two thousand parts, and their permanent and extensive character will be seen from the fact that, as testified by one of the witnesses, the building in which they were housed was, as he expressed it, "built around the machines and for the purpose of operating these machines, and that the buildings were practically valueless for any other purpose." In that regard the finding of the trial court was as follows:

"Gaumont machines are approximately thirty feet long and six feet high. The physical structure of the machine is important. The tank machines are composed of a succession of baths or tanks containing in order of use developing solution, fixing or hypo sulphide solution, and clear water for washing. The developing tank ordinarily consists of one compartment; the hypo tank of two compartments; and the washing tank of four compartments. An overhead casting rests on the upper edge of each compartment

carrying a driving shaft with toothed sprockets, one for guiding the film in and one for guiding it out, and also an iron frame consisting of two verticle rods and two horizontal shafts, one near the top and the other near the bottom of each compartment. The horizontal shafts carry a series of freely mounted hard rubber spools. At one end of the driving shaft is a beveled gear by which the shaft is driven. This structure is duplicated in each compartment. Between the developing tank and the hypo tank is a rinsing compartment with fresh water.

"The film is introduced over an initial sprocket into the compartment and is trained up and down over the upper and lower series of freely rotating spools, describing a general spiral course from one side of the compartment to the other. It is brought up out of the compartment over the second sprocket and is propelled towards the next liquid receptacle. After leaving the developing bath the film is rinsed in a tube and then enters the hypo section. The movement of the film within the compartments of the tanks is repeated until it has passed entirely through the wet end.

"In the tube machines, tubes are substituted for tanks. At the upper end of each tube is a free roller and a driven sprocket. The film passes into the tube over the free roller and forms a loop around a weighted free spool within the tube and passes up out of the tube over the driven sprocket into the next tube. The treatment of the film is the same as in the tank machines.

"The developing fluid is maintained in a central reservoir. Within this reservoir is a coil through which cold brine is circulated for the purpose of cooling, or steam for the purpose of warming, thus enabling the temperature of the developing fluid to be regulated and maintained at will.

"To every tank and tube machine there is annexed a cabinet or drying device. After the film has been treated in the liquid baths, it is conducted through the cabinet in which conditioned air is circulated to dry the film preparatory to winding it upon a reel. A series of spools on upper horizontal shafts and a parallel series of spools on lower horizontal shafts provide means whereby the film may be carried up and down a plurality of times in order to be thoroughly dried. In addition to the spools on the upper shafts, there are two sprockets keyed to the upper shafts to propel the film through the dryer."

Such being the character of the machines and the buildings in which they were permanently located on the ground, we turn to the acts and conduct of the parties. In that regard the court below found, and we agree therewith, as follows:

"Gaumont caused to be organized Gaumont Company and Gaumont Realty Company, New York corporations. Through them a laboratory was established at Flushing, Long Island, for developing motion picture films. In 1909 three tank machines were there installed and in 1911 three other tank machines were added. Thereafter they have been used more or less continuously. These machines were made in the workshops of Gaumont's French company. There was installed in the Flushing plant a machine shop fully equipped to repair and replace any parts of the developing machines that might become worn or broken. The laboratory at Flushing was operated by Gaumont through his two New York corporations from about 1909 to 1920. In the latter year Gaumont, the patentee, through his New York companies, sold the laboratory and equipment to Associated Screen News, Inc., for $100,000. Later in 1920, Gaumont and his French company agreed to sell to Patrick A. Powers twenty motion picture developing machines of the tube type with dryers for $82,500. Of this sum $30,000 was for the machines and $52,500 gross royalties. Powers assigned this agreement to Associated Screen News, Inc. The machines were installed in 1922 and the full price was paid by the purchaser. However, only six of these machines were operated until 1929.

"In 1929 Associated Screen News, Inc., leased the property and plant to the defendant Stephen J. DeVoe, with an option to purchase. This lease was assigned to the defendant Craft Film Laboratories, Inc., who exercised the option to purchase and thereafter operated the laboratory.

"The defendants admit that the twenty-six machines are constructed and operated in accordance with the claims of the patents in suit. The plaintiff admits that they are the twenty-six machines purchased from the patent owner.

"In the normal use and operation of these machines there was a constant replacement of parts. These parts were made in the machine shop at the plant, imported from the patentee in Paris, or purchased in the open market. All of these methods were employed by the Gaumont Company from 1909 to 1920 and the same methods were followed by Associated Screen News, Inc., and by defendant. Throughout this time no charge of

infringement was ever made until the present suit was brought."

A study of the testimony satisfies us that the construction of the machines as a whole was such as to require constant replacement. There were daily inspections to locate breaks or wear and to provide new parts. It will thus be seen that the machines were sold with an idea of constant replacement of parts, for otherwise they could not be operated. Here, as in Wilson v. Simpson, 9 How. 109, 126, 13 L. Ed. 66, it may be said: "If any constituent part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain, if he sells the use of his machine, that the purchaser uses it in the way the inventor meant it to be used, and in the only way in which the machine can be used." Here the parts were largely interchangeable, and, as replacements were needed, and in order to avoid delay, when one machine needed replacements and was not operative, parts were at times taken from such idle machines and used to put other machines in operative condition. Not only were there spare parts on hand when the property was sold, but the laboratory was equipped with machinery for making some of the needed replacements. Moreover, replacements were at times furnished from abroad by the French company. Indeed, for years, the whole conduct of the parties, the buyers of the machines, as well as the owners of the patent, was one that contemplated constant replacements, and that this course of conduct was one whose continuance was contemplated is seen from the fact that, when the patents were sold, the buyer agreed "that it will not sue, or in any way interfere with the enjoyment of * * * the use * * * of any machines heretofore sold," etc. What the parties to a contract do during its life is a persuasive evidence of what the contract was. "Tell me," said a common-sense judge, "what the parties have done and I will tell you what their contract means." Of the recognition of the replacement right of the buyers of these machines for years by Gaumont and his associates, there is no question. Their conduct in that regard is in accord with Gaumont's testimony: "The practically continuous operation of the developing machines naturally necessitates the replacement of certain parts. The greater part, if not all these parts were, at the beginning, supplied by the Société des Etablissements Gaumont. Subsequently, the Flushing Laboratory found it more to its advantage to make or to acquire the small replacement parts on the spot. It goes without saying that the purchaser of the said machines was entitled absolutely to procure replacement parts on the spot in order to be able to use the machines."

When Gaumont and his associates sold the patents, they exacted an "acceptance," wherein the purchaser agreed, as above noted, not to "sue or in any way interfere," etc. The purchasers and their successors pursued the same course of conduct for several years, made no complaint of the defendants replacing parts, gave no notice of infringement, and it was not until the suit was brought in June, 1930, four years after the present plaintiff's predecessors had acquired the patents, that the defendants' right to replacement was challenged.

To these facts we apply what was said in Heyer v. Duplicator Mfg. Co., 263 U. S. 100, 44 S. Ct. 31, 32, 68 L. Ed. 189: "We have only to establish the construction of a bargain on principles of common sense applied to the specific facts."

In view of the conduct of the parties, the acquiescence of the plaintiff's predecessors in title, and the long delay in asserting a stale and inequitable claim, the decree of dismissal was, in our view, warranted, and is therefore affirmed.